UNITED STATES of America, Appellee,

v.

John Peter CERONE, Appellant.

UNITED STATES of America, Appellee,

v.

Milton John ROCKMAN, Appellant.

UNITED STATES of America, Appellee,

v.

Joseph John AIUPPA, Appellant.

UNITED STATES of America, Appellee,

v.

Angelo LaPIETRA, Appellant.

UNITED STATES of America, Appellee,

v.

Joseph LOMBARDO, Appellant.

Nos. 86–1439—86–1443.

United States Court of Appeals,
Eighth Circuit.

Submitted May 11, 1987.

Decided Oct. 8, 1987.

Rehearing and Rehearing En Banc
Denied in No. 86–1440
Dec. 15, 1987.

Rehearing and Rehearing En Banc
Denied in No. 86–1441 Dec. 16, 1987.

Rehearing and Rehearing En Banc
Denied in No. 86–1439
Dec. 23, 1987.

Julius Echeles, Chicago, Ill., for appellant Cerone.

Allan Ackerman, Chicago, Ill., for appellant Aiuppa.

Frank Oliver, Chicago, Ill., for appellant Lombardo.

Louis Carbonaro, Chicago, Ill., for appellant LaPietra.

Alan Caplan, San Francisco, Cal., for appellant Rockman.

Frank J. Marine, Dept. of Justice, Washington, D.C., for appellee.

Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, and FAGG, Circuit Judge.

BRIGHT, Senior Circuit Judge.

John Peter Cerone, Joseph John Aiuppa, Joseph Lombardo, Angelo LaPietra and Milton John Rockman appeal their convictions for conspiracy to travel in interstate commerce and use interstate facilities with the intent to promote and carry on an illegal activity in violation of the Travel Act, 18 U.S.C. §§ 371, 1952, and on seven substantive Travel Act violations. The appellants raise nineteen allegations of error, some collectively, others individually. For the reasons discussed below, we affirm the convictions.

## I. BACKGROUND

The indictment charged that the defendants and several unindicted co-conspirators sought to maintain hidden financial and management interests in Las Vegas casinos, particularly the Stardust and Fremont, in violation of Nevada gaming laws. These casinos were owned by the Argent Corporation which, in turn, was owned by Allen R. Glick. Glick's purchase of the casinos was financed by the Teamsters Union Central States Southeast and Southwest Areas Pension Fund. The conspirators obtained control of Argent Corporation by helping Glick to obtain financing and by placing two of their people, Frank Rosenthal and Carl Thomas, in management positions at Argent. The conspirators also maintained control of the Teamsters Union and its

pension fund through Allen Dorfman, who secretly controlled the fund along with Roy Williams, a Teamsters official.

The Government charged that the conspirators were able to control Argent and the Union because they were members of organized crime "groups" in various Midwestern cities. Aiuppa was the boss of the Chicago group, with Cerone as its underboss. LaPietra and Lombardo were members of the Chicago group, and Rockman was an associate of the Cleveland group.[1]

At trial, the Government introduced the testimony of Glick, Angelo Lonardo, a Cleveland underboss, Roy Williams and Carl Thomas, among others. The Government also produced evidence consisting of tape recordings, notes made by DeLuna, and surveillance testimony by FBI agents.

According to the Government's theory of the case, in early 1974, Frank Balistrieri agreed to help Allen Glick obtain a loan from the Teamsters pension fund to buy the Stardust and Fremont casinos. Balistrieri obtained the assistance of Nick Civella and Milton Rockman, who each controlled a trustee of the pension fund. Glick then received his loan.

After Glick bought the casinos, Balistrieri and the others required Glick to promote Frank Rosenthal to a management position at Argent. Rosenthal supervised the skimming of gambling proceeds from the casinos. Later, Carl Thomas was placed in charge of the operation for a short time.

Initially, the Kansas City, Milwaukee and Cleveland groups shared the skimmed money. Shortly after the operation began, however, a dispute arose between the groups, and the Chicago group stepped in to resolve the problem. Thereafter, the Chicago group, including appellants Aiuppa, Cerone, Lombardo and LaPietra, shared the skimming proceeds.

Carl DeLuna, a member of the Kansas City group, maintained records of the conspirators' transactions and was the liaison

1. Co-conspirator Nick Civella headed the Kansas City group, and co-conspirator Frank Balistrieri was the head of the Milwaukee group.

between Las Vegas and Kansas City, and between Chicago and Kansas City. LaPietra became DeLuna's contact with the Chicago group after the death of a previous contact. Appellant Rockman also acted as a contact with DeLuna for the Cleveland group, and as an intermediary with the Chicago group.

Typically, the skimmed money was delivered from Las Vegas to Chicago. LaPietra delivered the skimmed money to Anthony Chiavola, Sr. of Chicago who, in turn, delivered the skimmed money to DeLuna for the Kansas City group and gave the Cleveland group's share to appellant Rockman.

During the period 1976 to 1979, Rosenthal had various widely publicized problems with the Nevada licensing authorities, who considered him to be unsuitable for working as a key employee of a casino. The conspirators were concerned that Rosenthal's problems might jeopardize their interests in Las Vegas casinos and in the skimming operations, and they had numerous conversations about replacing Rosenthal. During the same period, the conspirators also had problems with Allen Glick who was reluctant to accept their control of Argent through Rosenthal. Nick Civella and Carl DeLuna threatened to kill Glick if he did not acquiesce in their control of Argent through Rosenthal's direction. Glick yielded to their demands.

In October 1977, independent investment managers took over management of the pension fund's assets, which hindered the conspirators' ability to control the pension fund, to obtain loans and receive other favorable treatment. Thereafter, the conspirators, principally appellant Lombardo and Allen Dorfman, had numerous strategy discussions concerning their efforts to replace the independent managers and other individuals with persons controlled by the conspirators. From 1979 to 1981, the conspirators, including appellants Aiuppa, Cerone, Lombardo and Rockman, took measures to support Roy Williams to succeed Frank Fitzsimmons as Teamsters president

and later to support Jackie Presser to succeed Williams in order to maintain the conspirators' influence with the Teamsters Union.

In 1978, DeLuna told Allen Glick that his "partners" were "sick of" dealing with him and that they would kill him unless he sold Argent Corporation. Thereafter, Glick publicly announced his intention to sell Argent and three groups began to negotiate with Glick to buy Argent. In December 1979, Glick sold Argent to Trans-Sterling, Inc.

From March 1978 to May 1980, law enforcement officials conducted many court authorized electronic surveillances of various telephones and locations in Kansas City, Missouri; Leavenworth, Kansas; Las Vegas, Nevada; Chicago, Illinois; and Milwaukee, Wisconsin, including the residences of Carl DeLuna, Anthony Civella, Joe Agosto, and Anthony Chiavola, Sr., and the business offices of Allen Dorfman. Lombardo, Rockman and LaPietra were intercepted during the electronic surveillances.

Law enforcement officials also conducted various court authorized searches and seizures of records and documents. For example, on February 14, 1979, officials seized address and phone books, papers, and other documents from Carl DeLuna's home in Kansas City, Missouri, which contained DeLuna's notes of meetings and telephone conversations among the conspirators, telephone numbers and disbursement of funds in connection with the skimming operation (hereinafter "the DeLuna notes").

On September 30, 1983, a grand jury in Kansas City, Missouri, returned an eight-count indictment against fifteen defendants, charging them with violations of 18 U.S.C. §§ 2, 371, 1952. Carl Civella, Peter Tamburello, Anthony Chiavola, Sr. and Anthony Chiavola, Jr. entered guilty pleas prior to trial. The district court[2] severed the case of Anthony Spilotro from the others, and he died several months after trial.

2. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Eastern and Western Districts of Missouri.

Carl DeLuna and Frank Balistrieri pled guilty during trial. The court dismissed the indictment against Carl Thomas during trial, and he then testified as a government witness. After the close of the government's case, the court entered judgments of acquittal as to John and Joseph Balistrieri.

After a four-month trial, the jury returned guilty verdicts on all counts against the remaining defendants, Aiuppa, Cerone, Lombardo, LaPietra and Rockman. Aiuppa and Cerone were sentenced to consecutive prison terms totalling twenty and one-half years. Lombardo and LaPietra received consecutive sentences totalling sixteen years imprisonment. Rockman also received consecutive sentences, totalling twenty-four years. Each defendant was fined $80,000.

## II. DISCUSSION

### A. Sufficiency of the Evidence on Count I

■ All five appellants contend that the evidence was insufficient to convict them on count I, conspiracy to maintain an undisclosed interest in the gaming interests of Allen Glick. They argue that the evidence failed to show their maintenance of a hidden interest. Rather, at most, the evidence showed a common purpose to skim money by extortion, embezzlement or theft. Some of the defendants contend that the evidence showed that they were merely collecting a "finder's fee" for their assistance to Glick in obtaining his pension fund loan.

When reviewing the sufficiency of the evidence for a criminal conviction, we must view the evidence in the light most favorable to the jury's verdict. *United States v. Randle*, 815 F.2d 505, 508 (8th Cir.1987); *United States v. Roenigk*, 810 F.2d 809, 813 (8th Cir.1987). So viewed, we determine that the evidence was sufficient to convict the appellants on count I as charged in the indictment.

Uncontradicted evidence showed that Frank Rosenthal obtained a managerial position with Argent, that he directed the skimming operation at the casinos and that he acted at the direction and for the benefit of the conspirators. Frank Balistrieri, Nick Civella and Rockman obtained this influence over Argent by arranging for Glick to receive the pension fund loan. All the appellants shared in the skimming proceeds and discussed the working of the operation among themselves. As this court held in *United States v. DeLuna*, 763 F.2d 897 (8th Cir.1985), indirect receipt of gambling moneys without the necessary licenses and in violation of state law constitutes a violation of the Travel Act. 763 F.2d at 907. Furthermore, we note that the indictment here is nearly identical to that charged in the *DeLuna* case.[3] We are bound by *DeLuna*'s holding that evidence of the receipt of skimmed moneys from a Nevada casino serves as a sufficient basis to sustain the convictions under the Travel Act indictment. *Id.* at 906–07.

■ We also reject appellants' argument that a variance in proof existed from what was charged in the indictment. As discussed above, sufficient evidence existed to support the convictions as charged in the indictment. Furthermore, appellants can show no prejudice from any alleged variance. Prior to trial, several codefendants challenged the indictment, claiming that the charges were the same as those on which they had previously been convicted in the so-called Tropicana case, *United States v. DeLuna, supra*. In response, the Government submitted a detailed offer of proof as to what it expected to prove in this case. *United States v. Thomas*, 759 F.2d 659, 664–65 (8th Cir.1985). With this sort of information, appellants can claim no prejudice or surprise from the evidence presented at trial.

### B. *Pinkerton* Instruction

■ The appellants were indicted as aiders and abettors on seven substantive counts of violating the Travel Act. The court instructed the jury on theories of aiding and abetting, as well as vicarious liability under the doctrine of *Pinkerton v.*

---

**3.** *DeLuna* involved skimming from another Las Vegas casino, the Tropicana.

*United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[4] Appellants argue that the district court erred in submitting both theories to the jury. They contend that the evidence was insufficient to convict them of aiding and abetting. Consequently, the jury must have found them guilty by reason of vicarious liability. This, they claim, is improper because they cannot be convicted as principals under vicarious liability when they were indicted as accessories under an aiding and abetting theory.

Even assuming that the evidence failed to prove aiding and abetting, we do not agree with appellants' argument. Other circuits have held that persons indicted as aiders and abettors may be convicted pursuant to a *Pinkerton* instruction. *United States v. Meester*, 762 F.2d 867, 878 (11th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985); *United States v. Redwine*, 715 F.2d 315, 322 (7th Cir. 1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). Although appellants' argument may have some logical appeal, clearly the law fails to support their position.

### C. Double Jeopardy

Appellants claim that their convictions for conspiracy and for substantive acts taken in furtherance of the conspiracy under a theory of vicarious liability violate the Double Jeopardy Clause of the Constitution.

4. Under *Pinkerton*, a party to a continuing conspiracy may be responsible for substantive offenses in furtherance of the conspiracy even though that party does not participate or know of the substantive offenses.

5. Count I alleged that appellants conspired to use interstate facilities to carry on the unlawful activity of maintaining an interest in the gambling operations of Allen Glick and indirectly receiving gambling proceeds without being licensed in violation of Nevada gaming laws. Appellants obtained this interest through their control of the Teamsters Union Pension Fund.

6. Count II alleged that appellants aided and abetted Anthony Chiavola, Sr. on October 7, 1978 to travel and distribute unlawful gambling proceeds.

 Count III alleged that appellants aided and abetted Anthony Chiavola, Sr. on December 21,

■ It is well settled that no double jeopardy violation occurs when a person is convicted of conspiracy and a substantive overt act of the conspiracy. *Albernaz v. United States*, 450 U.S. 333, 344–45 n. 3, 101 S.Ct. 1137, 1145 n. 3, 67 L.Ed.2d 275 (1981); *Iannelli v. United States*, 420 U.S. 770, 777–78, 95 S.Ct. 1284, 1289–90, 43 L.Ed.2d 616 (1975). That the substantive conviction was obtained through a *Pinkerton* instruction is irrelevant. Rather, the focus must be on the offenses and whether each offense requires proof of a fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *see also Albernaz*, 450 U.S. at 337–39, 101 S.Ct. at 1141–42; *Whalen v. United States*, 445 U.S. 684, 691–93, 100 S.Ct. 1432, 1437–39, 63 L.Ed.2d 715 (1980).

The elements of criminal conspiracy (count I) are: (1) an agreement to commit an illegal act; (2) an unlawful objective; and (3) an act done in furtherance of the conspiracy committed by at least one of the participants. *United States v. Raymond*, 793 F.2d 928, 931–32 & n. 3 (8th Cir.1986).[5]

Counts II through VIII allege violations of 18 U.S.C. §§ 2, 1952, the elements of which are: (1) aiding and abetting; (2) the interstate travel or use of interstate facilities; (3) with intent; (4) to promote or manage an unlawful activity; and (5) the actual or attempted promotion or management of the unlawful activity. 18 U.S.C. §§ 2, 1952.[6]

1978 to make arrangements via telephone for meeting to discuss their interests in the gambling operation.

 Count IV alleged that appellants aided and abetted Carl Thomas on November 13, 1978 to discuss by telephone with Nick Civella the operation of the unlawful gambling activity.

 Count V alleged that appellants aided and abetted Carl DeLuna on November 16, 1978 to telephone and discuss a proposed change of ownership of Glick's casino with Joseph Agosto and the continuing receipt of unlawful gambling proceeds.

 Count VI alleged that appellants aided and abetted Carl DeLuna on November 20, 1978 to telephone Joseph Agosto and discuss the unlawful skimming operation.

 Count VII alleged that on January 11, 1978, John Cerone travelled to Kansas City to meet with Carl Civella, Carl DeLuna and Nick Civella

Upon analyzing the elements of the offenses, it is apparent that conspiracy includes an element that the substantive offense does not; namely, an agreement. Appellants, however, argue that the convictions violate the Double Jeopardy Clause because (1) under the *Pinkerton* theory of liability, conspiracy is an element of the substantive offenses, and (2) aiding and abetting requires or at least implies an agreement. Thus, under either of these arguments, double jeopardy is violated because each offense requires identical elements to be proven.

■ We cannot accept appellants' first argument. *Pinkerton* itself disposed of their argument. The Court there held that convictions for conspiracy and substantive acts committed in furtherance of the conspiracy do not violate the Double Jeopardy Clause, even though the substantive conviction was obtained solely by means of participation in the conspiracy. *Pinkerton*, 328 U.S. at 646–47, 66 S.Ct. at 1183–84. We are bound by *Pinkerton*.

Appellants' second argument in this regard is somewhat more difficult. They contend that the substantive offenses also require proof of an agreement because aiding and abetting implies that at least two people are involved and agree to be involved.[7] Thus, the substantive offenses and the conspiracy count require the same elements to be proven.

However, as the Supreme Court noted in *Iannelli*, agreement remains the essential element of (conspiracy) crime, and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact. 420 U.S. at 777, n. 10, 95 S.Ct. at 1289–90 n. 10.

Appellants are essentially advancing the application of Wharton's Rule, which requires merger of the substantive offense and the conspiracy when the substantive crime requires two or more persons for its commission. *Iannelli v. United States*, 420 U.S. 770, 773 & n. 5, 95 S.Ct. 1284, 1288 n. 5, 43 L.Ed.2d 616 (1975). The Rule itself does not rest on double jeopardy principles. *Id.* at 782, 95 S.Ct. at 1292. The Supreme Court has determined that Wharton's Rule is merely an aid in determining whether Congress intended to create separate offenses. *Id.* at 786, 95 S.Ct. at 1293–94. The Court noted that the crimes to which Wharton's Rule classically applied have three general characteristics: (1) general congruence of the agreement and the substantive offense; (2) the parties to the agreement are the only ones who commit the substantive offenses; and (3) the consequences of the substantive crime rest on the parties rather than society while the conspiracy does not pose the threats to society that the law of conspiracy seeks to avoid. *Id.* at 782–83, 95 S.Ct. at 1292–93.

Using these factors and examining legislative intent, the *Iannelli* Court analyzed a closely analogous offense to that charged here, 18 U.S.C. § 1955. The Court determined that Wharton's Rule does not apply to section 1955. Furthermore, the legislative intent behind the Organized Crime Control Act of 1970, of which section 1955 is a part, demonstrates a clear legislative judgment to punish conspiracy and the substantive offense as separate crimes. *Id.* at 791, 95 S.Ct. at 1297–98.

■ Applying these considerations to the present case, it is clear that Wharton's Rule does not operate to merge the conspiracy and the substantive offenses. Although the parties to the agreement are the same as those committing the substantive crimes, the conspiracy and substantive offenses are not generally congruent. The conspiracy contemplates a scheme much greater in scope than that encompassed by the substantive offenses. Furthermore, the consequences of the substantive crimes

to discuss the sale of Glick's casinos and their continuing skimming operation, and that the other appellants aided and abetted this act.

Count VIII alleged that appellants aided and abetted Carl DeLuna on January 16, 1979 to telephone Joseph Agosto and discuss a message to Joseph Aiuppa, the visit of John Cerone, Glick's casinos and the unlawful skimming operation.

7. Except for count II, the substantive offenses by themselves require two or more individuals to act together and thus imply an agreement.

do not rest solely on the parties, rather society at large is affected.

Most importantly, the legislative history underlying the Travel Act indicates that Congress did not intend conspiracy to merge with aiding and abetting a Travel Act offense. The Travel Act was enacted to provide federal assistance in the prosecution of organized crime. H.R.Rep. No. 966, 87th Cong., 1st Sess. 2, *reprinted in* 1961 U.S.Code Cong. & Admin.News 2664, 2665. Congress specifically intended that the Travel Act be prosecuted in conjunction with the aiding and abetting statute so that those who directed others to carry out their illegal missions could be prosecuted. H.R. Rep. No. 966, 87th Cong., 1st Sess. 3, *reprinted in* 1961 U.S.Code Cong. & Admin. News 2664, 2666. In addition, conspiracy was proposed as an element of section 1952, but was rejected. 107 Cong.Rec. 13,-943 (1961). Accordingly, we believe Congress intended that aiding and abetting a Travel Act offense be a separate offense from conspiracy, and double jeopardy principles are not violated by a prosecution for both offenses.

Thus, under either theory presented by appellants, the Double Jeopardy Clause has not been violated.[8]

### D. Jury Instruction

Appellants argue that the district court erroneously instructed the jury on intent. Specifically, they contend that the following instructions are erroneous:

Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement or act made or done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind.

You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide what facts to find from the evidence.

Jury Instruction No. 74; and

It is not necessary for the prosecution to prove that the defendant knew that a particular act or failure to act is a violation of the law. Unless and until outweighed by evidence in the case to the contrary, the presumption is that every person knows what the law forbids, and what the law requires to be done.

Jury Instruction No. 76.

Appellants contend that these instructions impermissibly shifted the burden of proof from the Government to the defendants and thus violated their due process rights. We do not agree.

First, Instruction No. 74 merely instructs the jury that it may find that a person intends the natural and probable consequences of his knowingly done acts. The creation of this inference does not necessarily violate due process. *Francis v. Franklin,* 471 U.S. 307, 314–15, 105 S.Ct. 1965, 1971–72, 85 L.Ed.2d 344 (1985); *see also Sandstrom v. Montana,* 442 U.S. 510, 515, 99 S.Ct. 2450, 2454–55, 61 L.Ed.2d 39 (1979). The challenged instruction violates due process only if "the conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.*

Applying this standard to the present case, it is clear that Instruction No. 74 does not relieve the Government of its burden to prove intent. Rather, it allows the jury to make an inference as to intent. Furthermore, the instruction immediately reminds the jury that the inference is merely permissive and that "it is entirely up to [the jury] to decide what facts to find from the evidence." Accordingly, Instruction No. 74

---

8. Nevertheless, we are troubled by the multiple sentences for convictions which, in essence, stemmed from the same activities, i.e., proof of Travel Act violations also served as proof of the conspiracy. The district court may wish to re- examine its imposition of consecutive sentences in light of these comments if appellants file a Rule 35 motion seeking modification of the sentences.

does not violate appellants' due process rights.

■ Instruction No. 76 presents a more difficult issue. Appellants contend that because the Travel Act offenses are specific intent crimes, the district court erred when it instructed the jury that every person is presumed to know the law.

Although we agree with appellants that the substantive Travel Act offenses are specific intent crimes, it does not follow that the challenged instruction is erroneous. The Government need not show that appellants knew that a law existed to penalize their conduct. *United States v. Golitschek*, 808 F.2d 195, 202 (2d Cir.1986). Sometimes, however, a specific intent crime requires that the defendant have knowledge of a legal requirement. *Id.*

In this case, appellants present a difficult issue. Knowledge of the licensing requirements under Nevada law would appear to be required for the Travel Act offenses. Instruction No. 76, however, seems to negate the Government's burden of proof in this regard.

■ Assuming that this instruction is erroneous, we must examine the record to determine whether such an error is harmless. *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986). Reviewing the record as a whole, we cannot say that the appellants received an unfair trial or that this error affected the composition of the record. The challenged instruction did not create a conclusive presumption, and another instruction advised the jury that the Government had to prove that appellants "knowingly did an act which the law forbids, purposely intending to violate the law." Jury Instruction No. 73. Moreover, the Government adduces ample evidence for the jury to find specific intent. Thus, in light of the record as a whole, any error in the jury instruction that may have introduced a confusing element as to the Government's burden of proving specific intent amounts to harmless error in this case.

## E. Disclosure of Informants

Appellants argue that they were deprived of a fair trial because the district court refused to disclose the identity of two confidential informants. Prior to trial, the appellants asked for the identity of the informants and any statements they made, stating that such information "may be relevant and helpful to the defense."

■ The district court examined various statements and reports *in camera* and also interviewed one of the confidential informants. The court found that one informant did not convey any information to the FBI that was relevant or helpful to the defense. The other informant conveyed information that was used by the FBI to establish probable cause for court-ordered surveillance. The court concluded that disclosure was not required in light of the circumstances of this case, the need for the informants' safety and the information they conveyed.

The district court did not abuse its discretion by refusing to disclose the identity of the confidential informants. In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court stated the governing test for disclosure. When disclosure of an informant's identity would be material and helpful, the public interest in protecting the flow of information is overcome. *Id.* at 60–62. The defendant has the burden of showing materiality. *United States v. Grisham*, 748 F.2d 460, 463–64 (8th Cir.1984). Because such a showing may be difficult, the district court may hold an *in camera* proceeding to determine materiality. *Id.* at 464.

In the present case, the appellants only speculated that the confidential informants could provide them with relevant and helpful information. Nonetheless, the district court examined the confidential information *in camera* and concluded that disclosure was not warranted. In reaching its conclusion, the court correctly applied the *Roviaro* test and looked to the circumstances of the case. Accordingly, the district court did not abuse its discretion when

it refused to order disclosure of the informants' identity.[9]

We are troubled, however, by the Government's admission on appeal that one of the informants actually testified at trial. This admission apparently came as a surprise to the appellants. The Government, however, has indicated that it informed the appellants at trial that one of the witnesses was a confidential informant.

This incident does not warrant reversal of appellants' convictions. The Government provided all the necessary information to defendants prior to the witness' testimony, and the defendants conducted a thorough cross-examination. Appellants have demonstrated no prejudice from the Government's later use of an undisclosed confidential informant as a witness. Accordingly, the district court's refusal to disclose the informant's identity and the Government's subsequent disclosure that one of the informants testified does not constitute any reversible error.

### F. Admission of Uncharged Crimes

Appellants argue that in numerous instances the district court erroneously admitted evidence of "other bad acts." Among other things, appellants challenge the admission of the statement that Allen Dorfman "was shot dead on the street," and prosecution's presentation of testimony by Angelo Lonardo, Ken Eto, Roy Williams and Aladena Fratianno. In this argument, the defendants also allege error in the introduction of the DeLuna notes that were also admitted at the prior Tropicana trial.

These contentions lack merit. Appellant Lombardo's counsel elicited the statement about Dorfman and no objection was made. Improper testimony by Lonardo was stricken from the record, and the court properly instructed the jury to disregard Lonardo's improper responses. The testimony of Williams, Eto and Fratianno did not implicate appellants in other crimes. Although the DeLuna notes were admitted in another trial to prove a different conspiracy, the notes admitted in the present case were relevant to prove the conspiracy charged. There is nothing impermissible in using the same evidence to prove two separate crimes. Evidence that is probative of the crime charged and not relevant solely to uncharged crimes is not "other crimes" evidence. *United States v. DeLuna*, 763 F.2d 897, 913 (8th Cir.1985). We determine that the district court committed no error as to the challenged evidence.

### G. Admission of Co-Conspirator Statements

All the appellants argue that insufficient evidence independent of co-conspirator statements existed and thus the co-conspirator statements, including the DeLuna notes, should not have been admitted. Without these statements, appellants argue that insufficient evidence exists to support their convictions.

We note that the admissibility of co-conspirator statements is determined by the trial judge and he may consider any relevant evidence in this determination, including the hearsay statements sought to be admitted. *Bourjaily v. United States*, —— U.S. ——, 107 S.Ct. 2775, 2780–82, 97 L.Ed. 2d 144 (1987). Furthermore, the trial court need only determine that a conspiracy existed and that a defendant participated in it. The court is not required to independently inquire into the reliability of the co-conspirator statement. *Id.* at 2782–83.

Accordingly, appellants' argument that the co-conspirator statements should not have been admitted because no independent evidence existed to show a conspiracy, and their participation in it, must be rejected.[10]

---

9. In addition, other relevant factors relating to the safety of the witnesses cautioned against disclosure. In 1982, Frank Rosenthal's car was bombed. In 1983, Allen Dorfman was shot and killed. In 1986, the bodies of co-defendant Anthony Spilotro and his brother were discovered in an Indiana cornfield. In light of the physical danger of the informants and the lack of materi-ality, the court's decision reflects an appropriate balancing of interests.

10. In addition, we observe that the Government produced direct evidence of the conspiracy and appellants' participation in it. Allen Glick and Angelo Lonardo testified to their personal knowledge of the appellants' activities.

Thus, the evidence, when viewed in the light most favorable to the Government, is sufficient to support appellants' convictions.

## H. Admission of DeLuna Notes

Appellant Aiuppa argues that the DeLuna notes were improperly admitted against him. He claims that the notes were not properly authenticated, were not in furtherance of the conspiracy, insufficient independent evidence connected him to the conspiracy, and the notes' admission violated his sixth amendment confrontation rights.

 As noted above, *Bourjaily v. United States, supra,* disposes of several of Aiuppa's arguments. It is not necessary that solely independent evidence connect Aiuppa to the conspiracy. Rather, the notes themselves may aid in the connection. 107 S.Ct. at 2782. Nor does their admission violate Aiuppa's confrontation rights. Because the notes were admissible as co-conspirator statements under Fed.R.Evid. 801(d)(2)(E), *DeLuna,* 763 F.2d at 909, Aiuppa's confrontation rights were not violated. The requirements for admission under the Federal Rules of Evidence are essentially the same as the confrontation clause requirements. *Bourjaily,* 107 S.Ct. at 2782.

 In addition, the evidence shows authentication of the DeLuna notes. An analysis of the notes seized in a search of DeLuna's home revealed that DeLuna had written the notes. The notes carried DeLuna's fingerprints. Thus, the notes were properly authenticated as declarations of a co-conspirator. *See DeLuna,* 763 F.2d at 908–09; *United States v. Helmel,* 769 F.2d 1306, 1312 (8th Cir.1985). The notes were also in furtherance of the conspiracy. They documented numerous meetings among the conspirators and other events, which were corroborated by surveillance and testimony of several witnesses. Accordingly, the district court committed no error in admitting the DeLuna notes.

## I. Voice Identification

 Appellant LaPietra argues that the Government failed to adequately identify his voice in several tape recorded phone calls and accordingly, those tapes may not be used to connect him with the conspiracy.

The district court did not err when it allowed the identification of LaPietra's voice. FBI Agent Thomeczek testified as to his supervision of the recordings and that he listened to all tapes used as exhibits. He also spoke with LaPietra several times after the indictment was issued and testified that the voice in question was that of LaPietra.

Any person may identify a speaker's voice if he has heard the voice at any time. *United States v. Smith,* 635 F.2d 716, 719 (8th Cir.1980); *United States v. Vitale,* 549 F.2d 71, 73 (8th Cir.), *cert. denied,* 431 U.S. 907, 97 S.Ct. 1704, 52 L.Ed.2d 393 (1977) (per curiam). Minimal familiarity is sufficient for admissibility purposes. Attacks on the accuracy of the identification go to the weight of the evidence, and the issue is for the jury to decide. *Smith,* 635 F.2d at 719; *Vitale,* 549 F.2d at 73.

Accordingly, the district court did not abuse its discretion when it admitted the identification of LaPietra's voice into evidence.[11]

## J. Withdrawal of Overt Act 51 From Jury Consideration

 LaPietra also contends that the district court erred when it instructed the jury to disregard overt act 51. At trial, it was admitted that LaPietra's voice was misidentified in the phone call constituting overt act 51. LaPietra argues that the court's instruction prevented the jury from considering exculpatory evidence because the misidentification was helpful to his defense.

We cannot agree with LaPietra's contention. The court did not instruct the jury to

---

11. LaPietra also argues that the evidence failed to show that he drove a car under surveillance on August 16, 1978. This argument is irrelevant because LaPietra was not charged with driving the car. The only relevant event for that date was a meeting among several co-conspirators, one of whom was LaPietra.

disregard evidence of misidentification. Rather, the court instructed the jury to consider LaPietra's defense of voice misidentification and to determine whether the identification was reliable under the circumstances. Jury Instruction No. 92. Accordingly, the court did not deprive LaPietra of his defense.

### K. Conspiracy Instruction

 Appellant Cerone argues that the district court erroneously instructed the jury that the defendants were guilty of conspiracy if they aided and abetted a substantive count. Alternatively, Lombardo contends that the district court erred by failing to limit the aiding and abetting instructions to the substantive counts.

Upon examining the jury instructions, we determine that appellants' arguments are without merit. The court correctly instructed the jury on the elements of conspiracy. The court then explained the three essential elements of the Travel Act so that the jury could consider the objects of the conspiracy. The aiding and abetting language refers to the substantive Travel Act offenses, not conspiracy. Furthermore, the court clearly instructed the jury that the "gist of the offense" was an agreement. Accordingly, the district court did not commit prejudicial error in its conspiracy instructions.

### L. Cerone's Conviction on Count VII

 Appellant Cerone argues that the evidence fails to prove that he traveled from Chicago to Kansas City for illegal purposes as alleged in count VII of the indictment. He contends that, at most, the evidence showed he traveled from Kansas City to Chicago. Because the evidence failed to support the offense charged in the indictment, Cerone argues that his conviction must be reversed.

Viewed in the light most favorable to the Government, the evidence showed that Cer-

one lived in Chicago and was observed leaving Kansas City on January 11, 1979 and arriving at the Chicago airport later that day. Earlier the same day, FBI agents observed Carl DeLuna pick up two unidentified men at the Kansas City airport. They later arrived at Anthony Civella's residence. DeLuna later drove Cerone to the airport in the same car observed earlier. In addition, a DeLuna note recorded that DeLuna met with Cerone and Civella on January 11, 1979 to discuss negotiations to buy Argent. Thus, although no direct evidence established the Chicago to Kansas City flight, the circumstances would enable the jury to infer that Cerone traveled from Chicago, that DeLuna picked up Cerone at the Kansas City airport for the purpose of meeting with Civella, and they discussed their illegal operation. Accordingly, a reasonable jury could convict Cerone on count VII, and we sustain his conviction.

### M. Identity of LaPietra's Code Name

LaPietra argues that the district court erred when it allowed FBI Agent Ouseley to testify as an expert witness and identify LaPietra as having the code name "Pitsacuni." He contends that Ouseley was not sufficiently qualified as an expert and that the evidence failed to support Ouseley's conclusion that LaPietra was "Pitsacuni." [12]

 A witness may testify as an expert if the "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue * * *." Fed.R. Evid. 702; *Federal Crop Ins. Corp. v. Hester*, 765 F.2d 723, 728 (8th Cir.1985). The trial court's determination of whether a witness qualifies as an expert will not be reversed absent an abuse of discretion. *Federal Crop Ins.*, 765 F.2d at 728; *Cashman v. Allied Prod. Corp.*, 761 F.2d 1250, 1254 (8th Cir.1985). A witness may be qualified as an expert based on practical experience. *Circle J Dairy, Inc. v. A.O. Smith Harvestore Prod.*, 790 F.2d 694, 700 (8th

---

**12.** LaPietra also asserts that the identification is based entirely on co-conspirator hearsay statements and that he is shown to be a member of the conspiracy through these same hearsay statements. As noted above, the trial court may consider hearsay statements in making preliminary determinations concerning admissibility of evidence. *Bourjaily*, 107 S.Ct. at 2780. Accordingly, LaPietra's argument in this regard is without merit.

Cir.1986); *Federal Crop Ins.*, 765 F.2d at 728.

Agent Ouseley testified that he had been an FBI agent for twenty-five years, had attended training schools, and had previously testified twelve times as an expert on the use of codes. In these circumstances, the district court did not abuse its discretion in allowing Ouseley to testify as an expert.

■ LaPietra's argument that the evidence did not support Ouseley's conclusion that Pitsacuni was LaPietra's code name speaks to the weight of Ouseley's opinion, not its admissibility. He was thoroughly cross-examined about the evidence upon which he based his opinion. Furthermore, the district court instructed the jury that expert testimony should be considered just like any other testimony and be given whatever weight the jury finds appropriate in light of the expert's qualifications and all the other evidence. Accordingly, we reject LaPietra's claim.

### N. Sufficiency of Travel Act Indictment

■ Appellant Lombardo alleges that the substantive counts of the Travel Act in the indictment fail to specify the particular acts that the defendants did in furtherance of illegal activity.

We reject Lombardo's contention. Generally, an indictment is sufficient if it sets forth the offense in the statutory language, provided that the statute sets out the necessary elements of the offense. *United States v. McKnight*, 799 F.2d 443, 445 (8th Cir.1986). Nonetheless, the defendant is entitled to a short, concise statement of facts constituting the offense charged, but he is not entitled to know the evidentiary details with which the government intends to convict him. *United States v. Gordon*, 780 F.2d 1165, 1169 (5th Cir.1986); *McKnight*, 799 F.2d at 445. In the present case, the indictments contained lengthy statements of fact, and Lombardo

clearly cannot claim inadequate notice of the acts with which he was charged. *See supra*, notes 6–7.

### O. District Court's Admonition to Lombardo's Attorney

■ Lombardo argues that he was unfairly prejudiced by the district court's admonition to his attorney, Mr. Oliver, in the presence of the jury. During cross-examination, FBI Agent Palmer testified that he had observed Lombardo driving a red and white vehicle and that he learned the car was registered to Lombardo. Mr. Oliver then asked Palmer "would it surprise you to learn [Lombardo] had never owned a red and white car?" The court then asked Mr. Oliver if he, as an officer of the court, could prove his statement because no evidence of Lombardo's lack of ownership had been entered on the record. The court informed Mr. Oliver that if he could not prove his representation, he would be disbarred and held in contempt. Lombardo contends that this exchange prejudiced him and affected the jury's verdict.

We do not agree. At the next court session, the court gave the jury a curative instruction, stating that the defendant was presumed innocent, was not required to produce evidence, and that the Government carried the burden of proof. The court's instruction served to correct any misunderstanding the jury may have had from the court's prior admonition to Mr. Oliver. Furthermore, the fact in issue, ownership and/or color of Lombardo's car, was not a critical issue. Although the admonition should not have been made in the presence of the jury, these remarks by the court cannot be deemed prejudicial error.

### P. Appellant Rockman's Claims [13]

■ Rockman argues that the district court erred when it ruled on the admissibility of co-conspirator hearsay statements at the close of the Government's case and not at the end of all the evidence. Thus, he

---

**13.** We address Rockman's claims as presented in his substituted supplemental brief. His original brief raised different issues which, although we do not discuss, lack merit. Although this substituted brief raises new issues after the initial briefing, we permitted its filing because of the extraordinary circumstances causing counsel's substitution and in the interest of fairness.

contends, statements and acts that occurred after the conspiracy had ended were erroneously admitted.

Rockman's argument alleges that the district court failed to follow the procedures mandated by *United States v. Bell*, 573 F.2d 1040 (8th Cir.1978). He contends that because *Bell* requires the court to rule on the admissibility of co-conspirator hearsay statements at the close of all the evidence, the district court prejudiced his ability to present his defense when it made its ruling at the close of the Government's case. Rockman contends that the court's premature ruling caused it to exclude testimony of Shannon Bybee, a Government witness, who was called by Rockman to testify that Glick had no gaming interests after 1979. Rockman argues that this evidence was crucial because the indictment charged that the illegal objective of the conspiracy was to maintain a hidden interest in the gaming interests of Allen Glick. Because Glick held no gaming interests after 1979, the district court erred in admitting co-conspirator acts and statements that occurred after 1979.

Initially, we note that it is not per se reversible error for the district court to make *Bell* findings at the close of the Government's case. *United States v. Legato*, 682 F.2d 180, 183 (8th Cir.), *cert. denied*, 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982). Rather, we must determine whether Rockman suffered any prejudice from the court's action. *Id.*

Rockman contends that he was prejudiced because he could not establish that the conspiracy ended in 1979 and thus prove subsequent statements inadmissible. Although we are troubled by the district court's exclusion of Mr. Bybee's testimony on Rockman's behalf, we cannot say that the court's action rises to reversible error. In essence, Rockman is alleging prejudice because the evidence varied impermissibly from the indictment. The indictment charged that the conspiracy lasted until 1983. Rockman argues that because the illegal objective was a hidden interest in Glick's gaming interests, the conspiracy

ended in 1979 with Glick's sale of his casinos.

As a variance argument, Rockman's challenge is without merit. He had ample and obvious notice that the Government was attempting to prove a conspiracy that endured until 1983. Furthermore, the jury knew of Glick's 1979 sale. The court also instructed the jury that co-conspirator statements made after the end of the conspiracy could be considered only against the person making them. Accordingly, the court did not commit reversible error in this regard.

## III. CONCLUSION

For the reasons stated above, we affirm the convictions.