**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 26 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.                                                                No. 03-4224

PATRICK BUSH,

      Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:01-CR-739-01-TS)**

---

Ronald J. Yengich (Peter D. Goodall with him on the briefs) of Yengich, Rich & Xaiz, Salt Lake City, Utah, for Defendant-Appellant.

Diana Hagen, Assistant United States Attorney (Paul M. Warner, United States Attorney), District of Utah, Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **BRISCOE** and **TYMKOVICH**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

A jury convicted Patrick Bush on five counts of distribution of cocaine or cocaine base in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2. The district court sentenced him to 188 months imprisonment followed by five years of supervised release. On appeal, Mr. Bush contends (1) the district court erred by admitting the lay opinion testimony of Detective Dale Bench identifying Mr. Bush's voice; (2) the evidence supporting identification of Mr. Bush on three counts was insufficient; (3) the court improperly considered an uncounseled conviction in calculating his sentence; and (4) the court violated the Sixth Amendment by basing his sentence on drug quantity amounts that were not found by the jury. We affirm.

I.

From October 2000 until February 2001, Detective Dale Bench participated in an undercover narcotics investigation in Salt Lake City, Utah. Posing as drug dealer Jason Black, Detective Bench conducted various drug transactions, including several purchases arranged via telephone conversations with a man named "J.R." Some, but not all, of the conversations were recorded. During the course of the operation, Detective Bench also purchased drugs directly from the defendant, Mr. Bush. At trial, Detective Bench testified and identified the voice of J.R. as belonging to Mr. Bush. Mr. Bush contests the identification, alleging

he merely participated in the drug transactions as J.R.'s "runner."

Detective Bench's identification of J.R. as Mr. Bush was based on the following events. On October 5, 2000, Detective Bench placed a call to a pager in an attempt to contact Tommy Carter, a drug dealer who went by the nickname "T.C." The detective had purchased cocaine from T.C. earlier that day and had inadvertently underpaid him by fifty dollars. A man identified as J.R. returned the detective's page, and stated that because he was T.C.'s supplier, the fifty dollars was owed to him. J.R. informed Detective Bench that he remembered him, describing the truck the undercover officer drove when he conducted the drug transaction with T.C. earlier that day.

On October 11, Detective Bench contacted J.R., offering to pay him the fifty dollars he owed. J.R. asked Detective Bench if he would like to purchase any drugs but the detective declined the offer. Later that day, the detective again paged J.R. and asked to meet to talk about business. J.R. suggested meeting at a bar but the pair did not make further plans at that time.

On October 26, Detective Bench paged J.R. but received a return call from a person whose voice he did not recognize. The caller asked, "Somebody page Pat?" Detective Bench replied, "I'm trying to get ahold of J.R." The caller gave the phone to J.R., who agreed to sell the detective an ounce of crack cocaine for $800. The detective and J.R. arranged to meet at a bar to complete the

transaction.

Detective Bench paged J.R. again that evening when he arrived at the bar according to plan. J.R. returned the call to report he would take a little longer than expected. An hour later, J.R. phoned Detective Bench, asserting he was outside the bar and wanted to meet by the detective's truck. When Detective Bench walked out to his vehicle, he noticed the man he later identified as Mr. Bush. Mr. Bush was standing by a white Ford Escort the detective recognized from the October 5 drug purchase. As Detective Bench walked by, Mr. Bush said "hi" and then entered the bar. Mr. Bush stayed in the bar very briefly and upon exiting instructed Detective Bench to follow him in his truck.

The detective followed Mr. Bush, who drove the Escort, and his passenger, Oscar Castaneda, until they pulled over to a curb. Mr. Bush and Mr. Castaneda then exited the Escort. Mr. Castaneda climbed into Detective Bench's truck and sold him 21.9 grams of crack cocaine, while Mr. Bush stood between the two vehicles acting as a lookout. During the transaction, Detective Bench asked Mr. Castaneda where J.R. was. The government concedes that, at the time, the officer was unaware J.R was a pseudonym for Mr. Bush.

On November 16, Detective Bench paged J.R. to order two ounces of crack cocaine. J.R. informed the detective he would need an hour to "cook it up," *i.e.*, convert it from powder to crack cocaine, and then he would send one of his runners to a bar to complete the transaction. Almost two hours later, Mr.

-4-

Castaneda called Detective Bench, who was at the bar, and told him to meet outside by the detective's truck. Detective Bench met Mr. Castaneda outside as instructed and both men got into the truck. After receiving the bag of crack from Mr. Castaneda, Detective Bench weighed the drugs and discovered the order was short by eight grams. Mr. Castaneda called J.R. about the problem on Detective Bench's cell phone and J.R. explained to the detective that the cocaine had lost weight during the conversion process. After J.R. promised to provide Detective Bench the missing eight grams on a later date, Detective Bench paid Mr. Castaneda $1600.

The following day, Detective Bench paged J.R. and requested the outstanding eight grams of crack cocaine. J.R. stated it would take time to make the drug, he wanted to wait until dark to do business, and he did not have anyone available to meet the detective at the time. A few days later, Detective Bench contacted J.R., who assured the undercover officer he had not forgotten about the eight grams. Although the detective instructed J.R. he would phone him the next day, the two did not speak again for nearly two months. The detective next contacted J.R. on January 11, 2001, and spoke to him about the outstanding eight grams of crack cocaine as well as his prospects of purchasing another ounce. Several phone conversations took place but a deal was never made.

On January 24, Detective Bench phoned J.R. to order an ounce of crack cocaine. J.R. told the detective he would meet him at a mall. When Detective

Bench arrived at the mall, J.R. called to say he was still preparing the drugs. Shortly thereafter, J.R. called the detective to determine where he was parked. Detective Bench informed J.R. where he was located, and Mr. Bush showed up outside the detective's vehicle. Mr. Bush climbed into Detective Bench's truck and asked him to move the vehicle to another area of the mall. After the detective satisfied that request, Mr. Bush handed him 25.7 grams of powder cocaine and said he had not had enough time to convert the drug to crack. When questioned by Detective Bench about this discrepancy, Mr. Bush reminded the detective of an earlier conversation they had had in which he told the detective that due to time constraints he would have to do the conversion himself. The detective paid Mr. Bush $800 and asked again about the outstanding eight grams of crack cocaine. Mr. Bush confirmed he would deliver the crack but said it would take some time.

On January 29, J.R. called Detective Bench and offered to sell him powder or crack cocaine at $650 per ounce if he was willing to purchase two or more ounces. On February 1, Detective Bench phoned J.R. and agreed to buy three ounces of crack cocaine. Later the same day, Mr. Castaneda called the detective to arrange a meeting at a grocery store. Detective Bench testified that, during that particular conversation, he could hear J.R. in the background instructing Mr. Castaneda.

J.R. phoned Detective Bench while the officer was en route to the purchase location and stated that because the crack cocaine had lost weight during

conversion, he would sell it for $600 per ounce. Detective Bench paged J.R. when he arrived at the grocery store, and J.R. told him that he was sending someone else to make the sale. Detective Bench observed Mr. Castaneda arrive and conduct what appeared to be another drug transaction in the parking lot. After completing that transaction, Mr. Castaneda entered the detective's truck and handed Detective Bench 50.2 grams of crack cocaine. Detective Bench weighed the drugs and told Mr. Castaneda he was an ounce short. Mr. Castaneda insisted Detective Bench speak to J.R. on a cell phone and the sale was subsequently completed for $1300.

Shortly after the transaction, someone called Detective Bench and asked, "Who's this?" Detective Bench replied, "Who's this?" to which the caller responded, "Pat." Detective Bench recognized the voice as J.R.'s. J.R. proceeded to complain that he had lost money on the deal that day and should have charged $750 per ounce. Detective Bench called back a few minutes later to complain that he had lost money as well, referring to the outstanding eight grams of crack cocaine. J.R. suggested that they call it even. The detective and J.R. contacted each other on four more occasions, including a final conversation which took place on February 15, 2001, but they never made another deal.

Mr. Bush was arrested on December 12, 2001. When Mr. Bush recognized Detective Bench at the scene of the arrest, he referred to him by his undercover name – Jason – and said, "I can't believe you are arresting me for something I did

in the past." Special Agent Jeanine DiGuiseppi was present during the arrest and overheard Mr. Bush's commentary.

As a result of the various drug transactions, Mr. Bush was indicted on five counts of distribution of cocaine or cocaine base (crack cocaine), and aiding and abetting the same, all in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2. Three of the counts on the superseding indictment named threshold drug quantities, with Count V charging the most: distribution of 50 grams or more of a mixture containing cocaine base. At trial, the parties stipulated that Mr. Castaneda, who did not testify, told a defense investigator that J.R. was not Mr. Bush. Mr. Castaneda would not disclose J.R.'s true identity. Mr. Bush was convicted on all five counts.

After adding one point for a prior uncontested misdemeanor conviction, the district court determined that Mr. Bush's criminal history category was III. Based on a total offense level of 34 and this criminal history category, Mr. Bush's guidelines range was 188 to 235 months. The district court sentenced Mr. Bush at the bottom of that range to 188 months imprisonment followed by 60 months of supervised release.

II.

Mr. Bush contends the district court improperly admitted, under Federal Rules of Evidence 602, 701, and 901, Detective Bench's testimony that the voice

of J.R. belonged to Mr. Bush. In particular, Mr. Bush claims that (1) Detective Bench's testimony was inadmissible lay opinion, and (2) could not be used to lay a foundation for the admission of the recorded telephone conversations between the detective and J.R. The government maintains Detective Bench had sufficient personal contact with Mr. Bush to make a voice identification and that any challenge regarding the detective's personal knowledge of Mr. Bush's voice should go to the weight of the evidence rather than its admissibility. It also argues the court properly admitted the detective's testimony to establish a foundation for the admission of the recorded conversations between Detective Bench and J.R.

We review a district court's determinations regarding admission of evidence for abuse of discretion. *United States v. Jenkins*, 313 F.3d 549, 559 (10th Cir. 2002). "We will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment." *Id.* (citations omitted).

We first address Mr. Bush's claim that Detective Bench's testimony was inadmissible lay testimony under Federal Rule of Evidence 701. Pursuant to Rule 701, a witness who is not an expert may offer opinion testimony only when it is

> (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.  Thus, Rule 701 permits the admission of lay opinion

testimony provided that it meets two criteria: a rational basis in perception and

helpfulness.[1]

"The perception requirement stems from F.R.E. 602 which requires a lay

witness to have first-hand knowledge of the events he is testifying about so as to

present only the most accurate information to the finder of fact." *United States v.

Hoffner*, 777 F.2d 1423, 1425 (10th Cir. 1985).[2]  When addressing the

admissibility of lay identification testimony, courts have been liberal in

determining the extent of perception required to satisfy the first requirement of

Rule 701.  Courts have likewise preferred to leave to juries any assessment of the

weight to be given to such testimony when there exist questions regarding the

quantity or quality of perception.  *See, e.g., United States v. Jackson*, 688 F.2d

1121, 1125 (7th Cir. 1982) (witness permitted to offer lay opinion identifying

defendant although only met defendant once); *see also United States v.*

---

[1]No argument has been raised that Detective Bench's testimony regarding his identification of Mr. Bush's voice falls within the scope of Rule 702.

[2]Mr. Bush raises a Rule 602 concern due to the alleged lack of personal knowledge on the part of Detective Bench regarding Mr. Bush's voice.  Since Rule 701 includes within it the standard for Rule 602, our Rule 701 analysis resolves Mr. Bush's 602 argument to his detriment.  *See* 29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6254 (1997) (hereinafter WRIGHT & GOLD) ("The requirement that lay opinion be based on the perception of the witness imports into Rule 701 the personal knowledge standard of Rule 602.").

*Henderson*, 68 F.3d 323, 326 (9th Cir. 1995) ("Instead of any particular amount of sustained contact, we require a lay witness to have sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful."). Moreover, the Advisory Committee Notes to Rule 701 state that inadequacies of the admitted testimony can be highlighted through the adversarial process:

> The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than the broad assertion, and a lawyer can be expected to display his witness to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness.

FED. R. EVID. 701, Notes of Advisory Committee on Proposed Rules.

Detective Bench spoke with Mr. Bush three times in person – when he met Mr. Bush at the bar on October 26, when Mr. Bush personally sold the detective cocaine in the mall parking lot on January 24, and when Mr. Bush was arrested on December 12. While two of those conversations involved rather abbreviated opportunities for Detective Bench to hear Mr. Bush's voice, the drug sale on January 24 included a longer and more substantial conversation. In fact, Detective Bench conversed with Mr. Bush both on the phone and in person on January 24. By that date, the detective was quite familiar with J.R.'s voice, having spoken with him numerous times over the phone. Indeed, when defense counsel raised the voice identification objection at trial, Detective Bench testified he "had several face-to-face and probably ten or 12, approximately, telephone

calls or more" with defendant.[3]  Aple. Supp. App. at 33.  He also testified that he was able to recognize Mr. Bush's voice.

On the basis of the detective's three face-to-face conversations with Mr. Bush, the numerous phone exchanges with J.R., and testimony that he could recognize Mr. Bush's voice, the district court permitted admission of Detective Bench's testimony over the defense's objection.  We find no fault with the court's determination that the threshold perception needed to permit the admission of the lay opinion testimony was satisfied.  The jury had the opportunity to consider any cross examination testimony and adverse evidence put forth by defense counsel, such as the stipulation that Mr. Castaneda said J.R. was not Mr. Bush.  And Mr. Bush was entitled to argue to the jury that the detective had inadequate contact with him and therefore was simply wrong in his identification, or that other

---

[3]Mr. Bush specifically objected that although Detective Bench may have had over ten substantive telephone conversations with J.R., the detective had insufficient contact with Mr. Bush in person to identify him as J.R.  Detective Bench met Mr. Bush for the first time on October 26, 2000, during a drug purchase where Detective Bench testified that Mr. Bush said "hi" to him, "told me to follow him," and "kept telling us to hurry up." Aple. Supp. App. at 60, 62. Although the drug sale itself was recorded, these brief interactions apparently were not and the jury therefore did not hear these exchanges.  On January 24, 2001, Detective Bench met Mr. Bush a second time in person.  The detective and Mr. Bush had a conversation of about 16 sentences, some of them consisting of only one word.  This conversation was recorded and played for the jury.  Finally, Detective Bench testified he heard Mr. Bush speak on December 12, 2001, at the time of his arrest, when he called Detective Bench by his undercover name – Jason – and said, "I can't believe you are arresting me for something I did in the past." *Id.* at 148.  No recording of this conversation was presented to the jury and Mr. Bush did not testify at trial.

evidence undermined the credibility of the detective's identification testimony.

Second, and in connection with Rule 701's helpfulness prong, we do not agree with Mr. Bush that the jury was in as good a position as Detective Bench to identify whether Mr. Bush and J.R. were the same person. In this regard, and despite his Rule 901 challenge to the entry of the audio tapes, see our discussion *infra*, Mr. Bush contends that because the jury heard audio recordings of both individuals' voices, Detective Bench's testimony was not helpful to the jury as required by Rule 701(b). We disagree. As detailed above, Detective Bench spoke with Mr. Bush in person on three occasions and had the direct opportunity to become familiar with his voice and to compare it to the voice of J.R. The jury was never able to hear Mr. Bush's voice in person because he exercised his right not to testify. Moreover, the jury was only able to hear audio recordings of one of the three face-to-face conversations between Mr. Bush and Detective Bench and to listen to some of the telephone calls between the detective and J.R., because not all of the calls between the two men were recorded.

In arguing that opinion testimony should not be permitted where the jury is in as good a position to make the identification as the lay witness, Mr. Bush relies on *United States v. LaPierre*, 998 F.2d 1460 (9th Cir. 1993). *LaPierre* is distinguishable from the instant case, if not inapposite. In *LaPierre*, a police officer investigating bank robberies allegedly committed by the defendant identified him in bank surveillance photographs. *Id.* at 1465. The Ninth Circuit

held that because the jury could view the photographs and identify the perpetrator, the officer's testimony "ran the risk of invading the province of the jury and unfairly prejudicing" the defendant. *Id.* Based in part on this reasoning, the court discouraged the use of lay opinion identification testimony. *Id.* We are not convinced that *LaPierre* applies here or furthers Mr. Bush's argument in any manner.

In *LaPierre*, the testifying officer, like the jury members, had never seen the defendant in person before the trial. *Id.* In essence then, the officer's identification of the defendant was no different from what the jury members themselves were required to do in comparing the surveillance photographs to the defendant in the courtroom. As a result, the court concluded the officer's overall level of familiarity with the defendant's appearance fell short of the standard of helpfulness required by Rule 701. *Id.* By contrast, Detective Bench conducted face-to-face conversations with Mr. Bush on at least three occasions and engaged in several phone conversations with J.R. The jury was denied an opportunity to engage in any comparison of Mr. Bush's voice to that of J.R. because Mr. Bush exercised his right not to testify at trial and only limited recordings were available from the phone conversations. Detective Bench's testimony was therefore helpful because it assisted the jury in determining a fact issue that was otherwise

hampered by Mr. Bush's constitutionally protected silence at trial.[4]  The district court's ruling regarding the admissibility of Detective Bench's lay opinion testimony was not an abuse of discretion.

Mr. Bush also argues that Rule 901, which requires authentication or identification to establish a foundation for evidence as a precursor to admitting audio recordings, was not satisfied when the district court admitted audio recordings of Detective Bench's conversations with J.R.  Rule 901 expressly permits the use of lay opinion testimony to form a foundation for a voice identification of a defendant:

> (a) **General Provision.**  The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

> (b) **Illustrations**.  By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule: . . .

>> (5) **Voice identification.**  *Identification of a voice*, whether heard firsthand or through mechanical or electronic transmission or recording, *by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.*

---

[4]Commentators have also noted that the *LaPierre* court's cautiousness about invading the jury's role is not in accord with the modern understanding of lay opinion testimony.  29 WRIGHT & GOLD § 6252 (also critiquing *United States v. Brown*, 540 F.2d 1048, 1054 (10th Cir. 1976), where we said "the test of admissibility is often predicated upon the proposition that opinion evidence cannot usurp the functions of the jury"); *see also* FED. R. EVID. 701 Advisory Committee Note ("necessity as a standard for permitting opinions and conclusions has proved too elusive and too unadaptable to particular situations for purposes of satisfactory judicial administration").

FED. R. EVID. 901 (emphasis added).[5]  Similar to Rule 701's perception requirement, voice identification testimony is permissible under Rule 901 where there exists "any basis for identifying the voice," "[leaving] all questions of weight and credibility for the jury."  *United States v. Watson*, 594 F.2d 1330, 1335 (10th Cir. 1979).

Such voice identification need only rise to the level of minimal familiarity. *See, e.g., United States v. Axselle*, 604 F.2d 1330, 1338 (10th Cir. 1979) (drug enforcement agent's identification of defendant's recorded voice was sufficient where agent heard his voice once during phone call and then identified the voice as that of the defendant after hearing him speak at a court hearing thirty days later); *see also United States v. Plunk*, 153 F.3d 1011, 1022-23 (9th Cir. 1998) (Rule 901(b)(5) sets "low threshold" for voice identifications and only requires that witness be "minimally familiar" with voice to identify it), *overruled on other grounds by United States v. Hankey*, 203 F.3d 1160, 1169 n.7 (9th Cir. 2000);

---

[5] Mr. Bush further argues the government should have been required to identify J.R. through the provisions in Rule 901(b)(6):

> **Telephone conversations.**  Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called . . . .

The examples set forth in Rule 901(b) are merely meant to be illustrative, and the district court is not bound to follow one measure over another.  We have previously upheld identifications based on telephone calls under the principles set forth in Rule 901(b)(5).  *See United States v. Axselle*, 604 F.2d 1330, 1338 (10th Cir. 1979).

*United States v. Cerone*, 830 F.2d 938, 949 (8th Cir. 1987) ("Any person may identify a speaker's voice if he has heard the voice at any time . . . . Minimal familiarity is sufficient for admissibility purposes."). Once minimal familiarity is satisfied, it is for the jury to assess any issues regarding the extent of the witness' familiarity with the voice. Detective Bench's testimony that he recognized Mr. Bush's voice as J.R.'s based on three face-to-face conversations and various exchanges via telephone is more than adequate to authenticate Mr. Bush's voice as that of J.R. for purposes of admissibility in conformance with Rule 901. All the rule requires is that the identifier, Detective Bench, have heard the voice of the alleged speaker, Mr. Bush, "at any time." FED. R. EVID. 901(b)(5). This standard has easily been met.

In conclusion, our review of the record convinces us that Detective Bench's testimony was admissible under Rule 701, and also met the minimal threshold of familiarity under 901 to permit admission of the audiotapes. As a result, the district court did not abuse its discretion by admitting Detective Bench's opinion testimony either for identification evidence or to lay a foundation for the admission of the voice recordings.

III.

Mr. Bush next argues there was insufficient evidence to support his convictions on Counts I, III, and V. We review challenges to the sufficiency of

-17-

the evidence *de novo*.  *United States v. Luzcano-Villalobos*, 175 F.3d 838, 842-43 (10th Cir. 1999).  "[W]e ask only whether taking the evidence–both direct and circumstantial, together with the reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."  *United States v. McKissick*, 204 F.3d 1282, 1289 (10th Cir. 2000) (quotation and citation omitted).  The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts.  *United States v. Nieto*, 60 F.3d 1464, 1469 (10th Cir. 1995).

Mr. Bush claims that even viewing the evidence in the light most favorable to the government, no jury could find beyond a reasonable doubt that he and J.R. are the same person.  We are not persuaded.  The voice identification testimony coupled with strong circumstantial evidence supporting those identifications was sufficient for a reasonable jury to find that Mr. Bush was J.R.

The government presented testimony from two witnesses who identified Mr. Bush as J.R.  In addition to the testimony of Detective Bench, case agent Jeanine DiGuiseppi, who heard Mr. Bush speak in person at his arrest on December 12, identified Mr. Bush as J.R. after listening to audio recordings of the conversations between the Detective Bench and J.R.  As discussed above, the credibility of the detective and case agent and the weight afforded their testimony was an issue for the jury.  *Watson*, 594 F.2d at 1335.

The government also presented strong circumstantial identity evidence supporting the jury's conclusion that Mr. Bush was J.R. Detective Bench arrived at the mall parking lot for the January 24 drug transaction and received a call from J.R., who stated he was at the mall and wanted to locate the detective's vehicle. After Detective Bench reported where he was parked, Mr. Bush arrived and climbed in the detective's truck, suggesting that Mr. Bush was the individual who had been speaking to the detective on the phone.

The content of the conversation between Mr. Bush and Detective Bench during the drug sale on that day further suggests Mr. Bush is J.R. Detective Bench remarked that the drugs resembled powder cocaine rather than the crack cocaine the detective had requested. In response, Mr. Bush said, "That's what it is man, remember I told you you gotta cook it 'cause I ain't had time. You told me to hurry up." Aple. Supp. App. at 147. The only individual Detective Bench had spoken to concerning the drug transaction was J.R. Similarly, Detective Bench and J.R. had conversed via phone several times concerning the eight grams of crack J.R. owed the detective from an earlier sale. During the January 24 drug sale, Detective Bench and Mr. Bush directly spoke about the eight grams:

> Bench: You getting me a, a quarter?
> [J.R.]: Naw, man . . . .
> Bench: You forgot? . . .
> [J.R.]: J, I'll get it to you, it'll just take a little bit.
> Bench: I know you're good for it man.

Aplt. App. at 147. The content of this conversation provided support for the jury

to find that Mr. Bush was the person calling himself J.R. who had been arranging drug deals with Detective Bench. Moreover, on February 1, 2001, J.R. called Detective Bench to complain that he had lost money on the January 24 drug deal. When the detective answered the call, J.R. said "Who's this?" to which Detective Bench responded, "Who's this?" J.R. replied, "Pat." Aplt. Supp. App. at 135. This conversation, in which J.R. identified himself as Pat, *i.e.* Mr. Bush, provides further support that Mr. Bush and J.R. are the same person.

The government points to other conversations providing circumstantial evidence of identity. On October 26, 2000, Detective Bench paged J.R. and the person who returned the call asked, "Somebody page Pat?" Aplt. App. at 131.[6] After Detective Bench answered that he had paged J.R., J.R. got on the telephone. Mr. Bush claims this evidence demonstrates *Mr. Bush* answered the phone, and then handed the phone to a different person – specifically, J.R. Conversely, the government argues that the person who returned the call was not Mr. Bush because the individual asked "Somebody page *Pat*?" rather than "Somebody page *me*?" In other words, the third-party reference to "Pat" suggests that the person who returned the call was not Mr. Bush.

Also on October 26, J.R. told Detective Bench he would meet him at a bar. After Detective Bench arrived at the bar, J.R. called and told him to go out to the

_____

[6]Detective Bench testified that he did not recognize this person's voice and it was not J.R.

parking lot and they would meet there. When the detective went outside, Mr. Bush was standing there, waiting. This evidence supports the argument that J.R. is simply a pseudonym for Mr. Bush.

Reasonable inferences drawn from the circumstantial evidence, viewed in a light most favorable to the government, corroborate Detective Bench's and Agent DiGuiseppi's lay opinion testimony regarding the identity of J.R. Given the strength of the direct and circumstantial identity evidence, we easily conclude a reasonable jury could find beyond a reasonable doubt that Mr. Bush was J.R and thereby guilty on Counts I, III, and V.

IV.

Mr. Bush also contends the district court committed error at sentencing by assessing one criminal history point for a prior uncounseled misdemeanor conviction. He maintains that he was unaware of his right to counsel when he pled guilty to the misdemeanor and that the government failed to prove he waived his Sixth Amendment right. Pursuant to U.S.S.G. § 4A1.1(c), this prior conviction resulted in an increase of Mr. Bush's criminal history category from II to III and an increase in his sentencing range from 168 to 210 months to 188 to 235 months imprisonment. The government neither disputes that Mr. Bush had the right to counsel in the prior case, nor that he was unrepresented. It argues instead that the burden was on Mr. Bush to show his right to counsel was not

waived, and that Mr. Bush failed to satisfy that burden. Thus, in order to resolve this controversy, we must determine who possessed the burden to prove or disprove waiver.

On appeal, we normally review a district court's interpretation and application of the sentencing guidelines *de novo*, and its factual findings for clear error. *United States v. Cruz-Alcala*, 338 F.3d 1194, 1196 (10th Cir. 2003). Because Mr. Bush did not raise this objection below, however, we review for plain error. In order to satisfy the plain error test, Mr. Bush must establish there is error, that is plain, and affects substantial rights. *United States v. Cotton*, 535 U.S. 625, 631 (2002). If these conditions are met, we may then exercise our discretion to notice the forfeited error if "the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 631-32 (internal quotations omitted).

Mr. Bush had a right to counsel for the prior misdemeanor conviction, for which he received a suspended term of imprisonment. *See Argersinger v. Hamlin*, 407 U.S. 25, 37 (1972); *see also Alabama v. Shelton*, 535 U.S. 654, 657-58 (2002). But the right to counsel can be waived. *Cruz-Alcala*, 338 F.3d at 1197. We have clearly held that once the government establishes the existence of a prior conviction, it becomes the defendant's burden to prove by a preponderance of the evidence that the conviction was unconstitutional. *Id.*; *United States v. Windle*, 74 F.3d 997, 1001 (10th Cir. 1996). This is so because a "presumption of

regularity" attaches to final judgments even when questions of waivers of constitutional rights are raised. *Parke v. Raley*, 506 U.S. 20, 29 (1992). In *Cruz-Alcala*, we concluded that "[t]o overcome this presumption, a defendant may not simply point to a silent or ambiguous record, but must come forward with affirmative evidence establishing that the prior convictions were obtained in violation of the Constitution." 338 F.3d at 1197; *see also United States v Wicks*, 995 F.2d 964, 977-78 (10th Cir. 1993).[7]

Mr. Bush has not met his burden to overcome the presumption of regularity. Records of his prior conviction were apparently destroyed. Although in a footnote in his brief he "denies that he waived counsel in the prior state proceedings and declares that he was not made aware that he had a right to counsel," aplt. br. at 38 n.7, he did not submit an affidavit to that effect. *See*

---

[7]In his attempt to argue otherwise, Mr. Bush relies on *Strachan v. Army Clemency & Parole Bd.*, 151 F.3d 1308 (10th Cir. 1998). There, we held a "defendant enjoys a presumption that he was denied his right to counsel, and that his conviction is therefore void" where the record of conviction fails to show representation by counsel or proper waiver of that right. *Id.* at 1311 (citing *Burgett v. Texas*, 389 U.S. 109, 114 (1967)). As we noted in *United States v. Cruz-Alcala*, 338 F.3d 1194, 1197 (10th Cir. 2003), however, *Strachan* failed to follow earlier circuit precedent on this point and the earlier precedent governs. Moreover, in *Parke v. Raley*, the Supreme Court limited its decision in *Burgett* by noting that at the time of the previous conviction at issue in *Burgett*, a state criminal defendant's federal right to counsel had not yet been established. 506 U.S. 20, 31 (1992) (citing *Burgett*, 389 U.S. at 114-15). While it was therefore previously reasonable to presume from a silent record that there had been no waiver of counsel, the Court observed that it was no longer reasonable to so presume. *Id.*

*Wicks*, 995 F.2d at 978 ("At a minimum, . . . a defendant pointing to a silent or missing record of a prior plea proceeding must begin by also submitting an affidavit or its equivalent asserting that the defendant's plea was in fact not voluntary or was lacking the necessary understanding, and specifying in detail the factual support for such assertion."). Whether Mr. Bush waived counsel was a factual matter he was required to establish at sentencing. When a factual issue is not raised below, there is no record on which to base our review. *See United States v. Saucedo*, 950 F.2d 1508, 1518 (10th Cir. 1991), *overruled on other grounds by Stinson v. United States*, 508 U.S. 36 (1993). For this reason, we hold generally that "questions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error." *Id.* at 1518 (quoting *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir. 1991)).

In sum, there was no error here, much less plain error. The district court correctly assessed Mr. Bush's criminal history points.


V.

Finally, Mr. Bush maintains the district court violated his Sixth Amendment right to a jury trial by imposing a sentence exceeding the maximum authorized by jury findings alone. *See United States v. Booker*, 125 S. Ct. 738, 756 (2005); *Blakely v. Washington*, 124 S. Ct. 2531, 2536 (2004). Specifically, he claims the court unconstitutionally increased his sentence when it found, by a preponderance

-24-

of the evidence, that his offenses involved at least 1000 kilograms but less than 3000 kilograms of marijuana equivalent, pursuant to U.S.S.G. § 2D1.1(c)(4).

In *Blakely*, the Supreme Court applied the rule it expressed in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to Washington state's determinate sentencing regime. *See Blakely*, 124 S. Ct. at 2536. Subsequent to briefing in the instant appeal, the Court extended *Apprendi* and *Blakely* to the Federal Sentencing Guidelines, holding that the Sixth Amendment requires "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. To remedy the Sixth Amendment violation inherent in the guidelines, the Court severed and excised 18 U.S.C. § 3553(b)(1), which required sentencing courts to impose a sentence within the applicable guidelines range, subject to departures in limited cases. *Id*. at 764-65. As a result, the guidelines are now advisory in all cases. *Id*. at 757.

The Court expressly stated that its "interpretation of the Sentencing Act" must be applied "to all cases on direct review." *Id*. at 769. Thus, we evaluate Mr. Bush's sentence in light of the Court's holding in *Booker*. Because Mr. Bush did not raise his Sixth Amendment argument in the district court, however, we review for plain error. FED. R. CRIM. P. 52(b); *see also United States v. Dazey*, No. 03-6187, 2005 WL 846227, at *19 (10th Cir. Apr. 13, 2005).

Although Mr. Bush's indictment did not charge a total amount of drugs, three out of five counts did allege threshold levels of drug quantity. Counts II and III each alleged that five grams or more of cocaine base were involved in those offenses, while count V alleged that fifty grams or more of cocaine base were involved in that offense. As a result, the jury necessarily had to find that Mr. Bush's offenses involved a total amount of 60 grams of cocaine base when it convicted him. The marijuana equivalent of 60 grams of cocaine base is 1200 kilograms, resulting in a base offense level of 32. *See* U.S.S.G. § 2D1.1(c)(4) (base offense level for distribution of a controlled substance is determined by the type and quantity of the substance; level is 32 if offense involved at least 1000 but less than 3000 kilograms of marijuana). The presentence report determined based on relevant conduct that Mr. Bush distributed the equivalent of 2137.30 kilograms of marijuana, resulting in the same base offense level of 32. Consequently, the judicially determined quantity of drugs did not result in "a sentence exceeding the maximum authorized by the facts established by . . . a jury verdict." *Booker*, 125 S. Ct. at 756. Hence, there was no Sixth Amendment violation.[8] *See United States v. Gonzalez-Huerta*, No. 04-2045, 2005 WL 807008,

---

[8]The court also added a two-point adjustment to Mr. Bush's offense level due to his role in the offense. *See* U.S.S.G. § 3B1.1 (increase offense by two levels if the defendant was an organizer, leader, manager, or supervisor in a criminal activity). Mr. Bush does not assert on appeal that this adjustment violated his Sixth Amendment rights. Even if he had raised this argument,

(continued...)

at *2-3 (10th Cir. Apr. 8, 2005).

For the aforementioned reasons, we **AFFIRM** Mr. Bush's convictions and sentence.

---

[8](...continued)
however, it would fail because (1) the jury found beyond a reasonable doubt that Mr. Bush was J.R. and (2) it was undisputed at trial that J.R. employed drug "runners," thus acting as a leader, manager, or supervisor in the drug distribution offenses.