NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

ANTHONY RICHARDS, *Appellant*.

No. 1 CA-CR 22-0245
FILED 5-23-2023

---

Appeal from the Superior Court in Yavapai County
No.  P1300CR201600476
The Honorable Debra R. Phelan, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Celeste Kinney
*Counsel for Appellee*

Law Offices of Stephen L. Duncan PLC, Scottsdale
By Stephen L. Duncan
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Daniel J. Kiley joined.

---

**M O R S E**, Judge:

¶1        Anthony Richards appeals his convictions and sentences for one count each of second-degree murder, trafficking in stolen property, theft of a credit card, forgery, and 19 counts of taking the identity of another.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        We view the trial evidence in the light most favorable to sustaining Richards' convictions.  *State v. Guerra*, 161 Ariz. 289, 293 (1989).

¶3        In February 2007, Richards and his friend, L.P., travelled from their respective homes in Christmas Valley, Oregon, and Murphys, California, to a remote 480-acre mining claim they owned in Yavapai County near Bagdad.  On the way, the two men stopped at an RV park in Quartzsite to visit D.K. and D.J., friends of Richards who were also gold-prospecting enthusiasts.  Richards expressed interest in buying their fifth-wheel camper trailer and agreed to buy it for $2,000.

¶4        Richards and L.P. again visited D.K. and D.J. sometime before April 9 near Wickenburg.  Richards paid $1,000 towards the purchase of the fifth wheel and asked to transfer the vehicle's title to his name.  D.J. declined to do so until Richards paid the remaining $1,000.

¶5        Richards, L.P., D.K., and D.J. then drove around the area scouting possible prospecting sights.  During the drive, Richards tried to convince D.K. and D.J. that they "needed a shaker table."[1]  D.J. later testified that Richards and L.P. sat in the backseat and "didn't seem to be getting along all that well."  Richards was "aggressive[ly] . . . trying to convince [L.P.] of something" while L.P. "adamant[ly]" refused.

---

[1]        According to the record, a "shaker table" is a large, high-standing, motorized table used to separate gold from dirt, gravel, and sand.

¶6  On April 9, 2007, L.P. purchased a $1,895 shaker table from a prospecting store in Salome. A few days later, Richards returned alone to D.K. and D.J.'s campsite with a "brand new" shaker table "as the rest of the payment on the trailer." When D.J. asked Richards about L.P., Richards said that L.P. became "violent," so Richards took L.P.'s gun, tied him up, and left him at the camp, presumably referring to his and L.P.'s campsite on their mining claim. D.J. then saw Richards partially pull a handgun from his pocket. When D.J. expressed concern for L.P.'s well-being, Richards said "he'll be okay."

¶7  Richards and L.P. were supposed to meet D.K. and D.J. two or three days later at a gathering of fellow prospectors. Richards arrived alone, explaining he "put [L.P.] on a bus to go back to California because he didn't want to be here anymore."

¶8  Sometime around the end of April 2007, L.P.'s neighbor in Murphys noticed that L.P.'s yard was not maintained, and his United States flag had been left up overnight for the past three or four weeks. Because L.P. meticulously cared for his yard and typically "took down his flag" every evening, the neighbor was concerned and called L.P.'s sister ("Sister"), who lived nearby. Sister went with the neighbor to L.P.'s home to investigate. They became suspicious when L.P. was not there but a garage door was unlocked and a garage light was left on, something L.P. "just wouldn't do[.]"

¶9  Sister talked to family members and L.P.'s friends and learned that L.P. had accompanied Richards on a prospecting trip. Sister then called and spoke with Richards on the telephone for almost four hours. During the conversation, Richards described the trips with L.P. to Arizona, and he exhibited detailed knowledge of L.P.'s financial affairs. Richards repeatedly claimed that L.P. owed him "a lot of money," and he "was really upset" that L.P. had not paid him back. Richards told Sister that he dropped L.P. off at home in Murphys when they returned from their April trip to Arizona. Richards also explained that he last saw L.P. on May 3, 2007, at Richards' Oregon home when he gave L.P. and an unidentified person information about prospecting locations on the way to California.

¶10  Sister later collected mail from L.P.'s post-office box, including uncashed checks payable to L.P., bills, and bank statements. Sister noticed that L.P.'s credit card had been used for "odd and unusual . . . charges" in California, Oregon, and Arizona after he left for Arizona with Richards. Sister gave the credit card statements to a local sheriff's deputy. Sister and other friends of L.P. made recorded calls to

Richards and gave the recordings to law enforcement. In one of those recorded calls, Richards said that he paid $1,000 as his half-share of the fifth-wheel trailer, and L.P. "was supposed to pay half."

¶11 California and Arizona law enforcement officers began investigating L.P.'s disappearance and the subsequent use of his credit card. The Yavapai County Sheriff's Office ("YCSO") investigation into L.P.'s disappearance eventually became a "cold case."

¶12 In 2012, a retired police officer, who volunteered with YCSO, began working the cold case. He interviewed approximately 50 people and none of them had seen or heard from L.P. since April 9, 2007. When the retired officer and the lead YCSO detective interviewed Richards at his home in 2016, they found an ATV registered to L.P. They also found a utility trailer and a cart that were purchased with L.P.'s credit card in Oregon on April 28, 2007. During the interview, Richards claimed two individuals saw L.P. after Richards and L.P. purportedly returned from Arizona. But those individuals subsequently told the retired officer and detective that they did not see L.P. after the April 2007 prospecting trip.

¶13 By 2016, the investigation's focus shifted from a missing-person case to locating L.P.'s body. A drone flight over Richards and L.P.'s mining claim, approximately 400 feet from their campsite, revealed a hole in the ground that appeared "very indicative of mine shafts or test holes found all over the state." On January 17, 2017, YCSO detectives used a backhoe to dig out the hole and discovered skeletal human remains, articles of clothing, shoes, and rope. The remains constituted "almost a complete skeleton" and included a "series" of fractured ribs. Three fired bullets were found in the dirt under the remains.

¶14 A forensic anthropologist examined the skeleton and determined that its condition was consistent with being underground for ten years. The anthropologist used dental records to identify the skull as L.P.'s. Of the multiple injuries to the skeleton from, at, or near the time of death, the anthropologist identified fractures to the fifth and sixth left ribs near L.P.'s heart as the most important because they were not "crush" injuries; rather, the "curvilinear scalping" of the ribs indicated "[s]omething hard went through" them with deadly force. The anthropologist testified that the ribs might have been broken by a bullet, screwdriver, or miner's pick. The medical examiner opined that homicidal violence caused L.P.'s death. The medical examiner also testified that the broken ribs could have been caused by gun shots or blunt force trauma. No evidence indicated L.P. had been buried alive.

¶15 The State charged Richards with one count each of first-degree murder, trafficking in stolen property, theft-possession of stolen property ("Count 3"), theft of a credit card, forgery, and 19 counts of taking the identity of another. The trial court subsequently dismissed Count 3.

¶16 At trial, the court denied Richards' motion for judgment of acquittal under Arizona Rule of Criminal Procedure ("Rule") 20. The jury found Richards guilty of second-degree murder as a lesser-included offense of first-degree murder. The jury returned guilty verdicts as to the remaining offenses as charged, and the jury found the State established multiple aggravating factors. The court imposed a combination of concurrent and consecutive aggravated prison sentences, totaling 31 years. Richards timely appealed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

### I. Sufficiency of Evidence.

¶17 Richards argues the trial court erred by denying his Rule 20 motion. Limiting his argument to the murder charge only, Richards contends insufficient evidence established "the immediate circumstances of [L.P.'s] death."

¶18 "A judgment of acquittal is appropriate when 'no substantial evidence [exists] to warrant a conviction.'" *State v. Nunez*, 167 Ariz. 272, 278 (1991) (alteration in original) (quoting *State v. Clabourne*, 142 Ariz. 335, 345 (1984)); *see also* Ariz. R. Crim. P. 20(a)(1). "Substantial evidence is proof that reasonable persons could accept as sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *State v. Spears*, 184 Ariz. 277, 290 (1996). "Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996) (quoting *State v. Scott*, 113 Ariz. 423, 424-25 (1976)). Sufficient evidence may be direct or circumstantial and "is such proof that 'reasonable persons could accept as adequate . . . to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Borquez*, 232 Ariz. 484, 487, ¶ 9 (App. 2013) (quoting *State v. Mathers*, 165 Ariz. 64, 67 (1990)). Thus, if substantial evidence of guilt exists, proof of an offense's "immediate circumstances" is not necessary to properly deny a Rule 20 motion.

¶19 We review *de novo* a trial court's denial of a Rule 20 motion. *State v. Bible*, 175 Ariz. 549, 595 (1993). In conducting our review, we test

the evidence "against the statutorily required elements of the offense," *State v. Pena*, 209 Ariz. 503, 505, ¶ 8 (App. 2005), and do "not reweigh the evidence to decide if [we] would reach the same conclusions as the trier of fact," *Borquez*, 232 Ariz. at 487, ¶ 9 (citation omitted).

**¶20** A person commits second-degree murder by either intentionally (but without premeditation) or knowingly causing the death of another or by causing the death under circumstances manifesting extreme indifference to human life and recklessly engaging in conduct that creates a grave risk of death. A.R.S. § 13-1104(A).

**¶21** Viewed in the light most favorable to sustaining the second-degree murder conviction, substantial circumstantial evidence indicates that Richards killed L.P. The State presented evidence of a motive through the dispute between Richards and L.P. over the potential trade of L.P.'s shaker table for D.K. and D.J.'s fifth-wheel trailer. *See State v. Hunter*, 136 Ariz. 45, 50 (1983) ("[I]t is well settled that in a murder prosecution the presence or absence of motive is relevant."). And significantly, when Richards gave the shaker table to D.K. and D.J., he admitted he bound L.P. with rope and took L.P.'s gun before leaving him alone at their desert campsite. Based on the bullets found in the clandestine grave and the injuries to L.P.'s ribs that could have been caused by bullets, the jury could reasonably conclude that L.P. survived being bound, but when Richards returned to their campsite, he shot and killed L.P. before burying the body. Alternatively, the jury could reasonably determine that L.P. died when Richards tied him up and left him in the desert, before Richards returned and buried the body.

**¶22** Based on the evidence, a reasonable jury could find that Richards either killed L.P. intentionally, or he did so by recklessly creating a serious risk of death under circumstances manifesting an extreme indifference to L.P.'s life. Moreover, the jury could reasonably infer Richards attempted to cover up the murder based on his explanations for L.P.'s disappearance and other statements that were later determined to be either inconsistent, unsubstantiated, misleading, or demonstrably false. As noted, the jury could conclude that Richards repeatedly lied about L.P. returning safely to California, either with Richards or by himself on a bus. *See supra* ¶¶ 7, 9; *State v. Fulminante*, 193 Ariz. 485, 494, ¶ 27 (1999) ("The state's evidence may be summarized as demonstrating that Defendant made several false, misleading, and inconsistent statements to police, other witnesses, and his wife—showing consciousness of guilt."); *see also State v. Crain*, 250 Ariz. 387, 395, ¶ 25 (App. 2021) (citing the "well-settled principle

that false exculpatory statements are evidence—often strong evidence—of guilt" (quoting *United States v. Davis*, 909 F.3d 9, 19 (1st Cir. 2018))).

**¶23**     Because probative facts support Richards' second-degree murder conviction, the trial court did not err in denying the Rule 20 motion. *See Fulminante*, 193 Ariz. at 494, ¶ 28 (finding "sufficient evidence from which the jury could have pieced together a web of suspicious circumstances tight enough that a reasonable person could conclude, beyond a reasonable doubt, that Defendant was the perpetrator").

## II.     Identification.

**¶24**     Richards challenges the trial court's admission of the recorded telephone conversations he had with L.P.'s friends.  The recordings were admitted over Richards' objection during the testimony of a retired YCSO detective who had obtained them early in the investigation.  As he argued at trial, Richards contends the recordings lacked sufficient foundation as to the identification of his voice.

**¶25**     "To authenticate an item of evidence, the 'proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.'"  *State v. Forde*, 233 Ariz. 543, 563, ¶ 74 (2014) (quoting Ariz. R. Evid. 901(a)).  We review the admission of evidence over an authentication objection for an abuse of discretion.  *Id.*

**¶26**     The detective testified that he talked with Richards on the telephone in August 2007, and when he later received the recordings and listened to them, he could identify Richards' voice "[a]s best [he] could."  The detective further testified that L.P.'s friends can be heard on the recordings referring to the other person on the calls as "Anthony."  The detective explained he had no reason to believe those references were to someone other than the defendant, Anthony Richards.  The detective's testimony therefore provided sufficient foundation for the jury to conclude the telephone recordings depicted Richards' voice. *See United States v. Bush*, 405 F.3d 909, 919 (10th Cir. 2005) (noting that foundation for "voice identification need only rise to the level of minimal familiarity" and only requires the identifier to "have heard the voice of the alleged speaker . . . 'at any time'").  The recordings were properly authenticated, and the trial court did not abuse its discretion.

**¶27**     Richards also challenges the recordings' admission because there was no testimony regarding (1) "the audio quality of the [detective's] call . . . with [Richards,]" (2) "whether [Richards'] voice was normal at the time of the call," or (3) "whether [the detective's] hearing at the time of the

call was at a normal level of function, or if it was impacted by some circumstance." But those issues go to the weight of the evidence, not its admissibility. *See State v. Lavers*, 168 Ariz. 376, 386 (1991) ("The judge does not determine whether the evidence is authentic, but only whether evidence exists from which the jury could reasonably conclude that it is authentic."); *State v. George*, 206 Ariz. 436, 446, ¶ 31 (App. 2003) (noting that, where a letter was unsigned, but other circumstances supported its admissibility, "any uncertainty about [the letter's] authorship went to the weight of the evidence, not to its admissibility"); *see also Bush*, 405 F.3d at 919 ("Once minimal familiarity is satisfied, it is for the jury to assess any issues regarding the extent of the witness' familiarity with the voice.").

### III.    Cause of Death.

**¶28**        Richards argues the trial court committed fundamental error by not striking the medical examiner's testimony that "[t]he possibility of [L.P.] also being buried alive cannot entirely be ruled out." But defense counsel elicited that testimony during cross examination and later attempted to use the testimony to cast doubt on the medical examiner's other conclusions. Accordingly, Richards invited any error, and we do not address whether fundamental error occurred. *See State v. Pandeli*, 215 Ariz. 514, 528, ¶ 50 (2007) (concluding defendant invited evidentiary error when defense counsel explicitly informed the trial court that he did not object to the admission of evidence in question); *State v. Logan*, 200 Ariz. 564, 565, ¶ 9 (2001) ("If an error is invited, we do not consider whether the alleged error is fundamental. . . .").

### CONCLUSION

**¶29**        Richards' convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:    AA