On Motion For Rehearing

CIKLIN, J.
We deny appellee’s motion for rehearing, withdraw our previously issued opinion, and substitute the following in its place.
The defendant, Robert Alvarez, and the co-defendant, Darnell Razz, were tried by one jury and each convicted of two counts of first-degree murder with a firearm while masked and one count of robbery with a firearm while masked. Alvarez argues the court committed reversible error when it permitted a detective to testify that — based on the officer’s extensive viewing of a surveillance video — he deter *539 mined the two people who committed the robbery and murders were a light-skinned male who was white or Hispanic, and a dark-skinned male.[1] We find the court erred and because the error was not harmless, we must reverse and remand for a new trial.

Facts

In 2010, two employees were fatally shot during a robbery at a Circle K convenience store. According to the state’s theory of the case, a handgun-carrying Alvarez entered the store first while Razz guarded the store’s front entry with a rifle. When Alvarez hit the employee who was emptying the cash drawer, his handgun discharged. At that point, under the prosecution’s theory, Razz shot and killed both employees. At trial, the state’s evidence revealed the following.
Sometime shortly after 11:00 p.m. on the night of the crime, a resident of a nearby mobile home park heard two gunshots coming from the direction of the Circle K store. He saw two people dressed in black clothing running from the direction of the store. One of them was carrying a handgun.
At about 11:45 p.m., officers responded to the Circle K store, where they were greeted by the strong odor of gun smoke before discovering the bodies of two store employees. The medical examiner confirmed the employees died from gunshot wounds.
Alvarez’s friend, Marshayla Garland, testified that earlier that night, Alvarez requested she pick him up at 10:00 p.m. at an apartment complex near the Circle K store. She did so and also accommodated his request that they stop to pick up Razz and take them both to the parking lot of a recreation center behind the Circle K store. Alvarez was wearing a black shirt and carrying a book bag. The men exited the vehicle without telling Garland where they were going. It was dark and Garland could not tell where the men went. While they were gone, she was listening to music in her car and did not hear any gunshots. When the men returned a short while later, Razz was carrying a “big gun” and both men were “frantic” and breathing heavily. Garland testified they told her to “[t]ake off,” and “get out of here.”
According to Garland, she picked up Alvarez and Razz after she left a movie theater. When asked what time the movie began, she stated, “I’m not sure. It was early movie, though.” She clarified it was “[a]n early night movie,” and that she picked up the men “later during the night.” Although Garland saw a newscast about the robbery shortly after it occurred, she waited months before telling law enforcement officials about her encounter with Alvarez and Razz. On cross examination, Garland wavered when asked whether she ever told law enforcement something-that differed from her trial testimony. Cell phone records confirmed that Alvarez and Garland communicated by text during the early evening hours on the day of the robbery.
Video footage from the store’s surveillance system showed two people entering the store dressed in black clothing and wearing extensive masks and gloves. The first person entering the store carried a handgun, and the person who followed behind held a rifle. The video did not give a clear or otherwise meaningful view of the skin color of either of the perpetrators. Enlarged still photographs taken from the video were introduced into evidence and likewise these pictures did not reveal the skin color of the robbers with any certainty. Law enforcement officials were not *540 able to recover any fingerprints or other physical evidence placing Alvarez or Razz at the crime scene.
Law enforcement officers testified that a projectile was recovered from the scene of the crime. A firearms examiner testified that the projectile matched a handgun that a witness saw Razz throw into a lake about two weeks after the robbery. A detective testified that someone sent Alvarez a text informing him that the lake was being searched, and Alvarez reportedly texted back the word, “Pray.”
A prisoner serving a lengthy sentence testified that he sold Alvarez a handgun and a rifle. He identified the handgun recovered from the lake as the one he sold Alvarez, although it had changed color from being submerged in the lake. He was sentenced after he gave law enforcement this information, but he denied receiving any benefit for his testimony.
Another prisoner, this one a convicted felon many times over who was facing thirty years in prison at the time of. trial, testified that he and other inmates, including Alvarez, were watching a newscast featuring the Circle K robbery. He testified that he heard Alvarez say that law enforcement did not have a case.
A corrections officer testified that while Alvarez and other inmates were watching a true crime television show which aired the surveillance video, Alvarez stated, “I shot him with that chopper.” The corrections officer also overheard Alvarez make this statement to another inmate during a private conversation.
The primary issue on appeal concerns the testimony of one of the lead homicide detectives in the case. The detective testified that he watched the surveillance video many times during the investigation. The following courtroom exchange occurred:
Prosecutor: And you indicated that you viewed the video to see if you could ID anyone. Were you able to see their faces on the video?
Detective: Yes.
Prosecutor: Okay. Were you able to see them, with clarity to make an identification, meaning like looking at it and saying, oh yeah. That so and so or—
Detective: At the time of the incident, when I viewed it on scene at the Circle K, I did not spend a significant amount of time looking and analyzing this video. But over time, as I reviewed the video, yes I was.
[[Image here]]
Prosecutor: How many times would you say that you’ve had an opportunity to since view that video, after that night?
Detective: Dozens, endlessly ... Probably fifty to seventy-five, easy.
Prosecutor: And what was the purpose of watching the video so many times?
Detective: To try to gather more information, more evidence. Get a better understanding. Try to identify certain things, the firearms or the people involved, what the victims did, their actions. Just to get a total understanding of everything.
Within seconds of the prosecutor’s direct examination of the detective regarding the detective’s extensive viewing of the surveillance video, attorneys for both defendants approached the bench at which time the following discussion took place:
Attorney for Razz: The video is in evidence. It’s previously been introduced. [The] Detective ... is going to give kind of Monday night football play by play about what he saw, Judge. It’s up to the jury to decide what they saw on the video, not what [the] Detective ... did. We don’t want his opinion on — he hasn’t been *541 qualified as an expert on identification or anything. And we don’t want him to give any opinions about what any of the evidence means. That’s up to the jury-
Attorney for Alvarez: So I would just add — I would just add specifically, he’s listed as Category A witness. He is not delineated as an expert. There has been no providing of any expert opinion. If it is not an expert opinion, it is supposedly opinion for identification purposes. That has not been previously advised of. That is improper opinion and it’s conclusory. So, if it— it sounds like he’s working up to a point where he’s going to say that guy is black or this one is white or any identifiers.
[[Image here]]
Prosecutor: Judge, I anticipate, where I’m going with it is that he needed to watch the video. They’re going to make a big deal that the projectile wasn’t found the first night. And that they kept going back to look for it. And I want him to explain why they thought a projectile still may be in the store. And that’s because, after watching the video, he’s going to testify that once he was able to sit down and watch it, it appeared as if the gun may have recoiled. Indicating that it may have been shot. So they went back to the store and kept searching for a projectile. And then they find one. It’s to explain why he’s—
The Court: I feel like I’m witnessing two trains passing in the night.
[[Image here]]
The Court: That’s what he’s worried about.
Prosecutor: He is going to say that he—
The Court: He is.
Prosecutor: — watched the video. And that he put a BOLO out for a white person and a black person.[2]
Despite the objections, the trial court’s admonitions and the state’s assurances at the bench conference, the state immediately resumed its objectionable direct examination of the detective:
Prosecutor: So, I believe we left off that you — after that night, you then had occasion to view the video a few more times?
Detective: Yes.
Prosecutor: Okay. Based on viewing the video a few more times, were you able to make a determination of what color of skin the suspects may or may not have had?
Detective: Yes.
[[Image here]]
Prosecutor: When you put out the information, regarding the suspects, what gender and color of person were you looking for?
[[Image here]]
Detective: A light-skinned Hispanic male or a white male, for suspect one. And a dark-skinned male for suspect two.[3]
*542 Although the question was framed in the context of the investigation, the state’s reference to the investigation was gratuitous. The record before us clearly reflects that the detective’s testimony, as it related to the skin color and race of the perpetrators on the surveillance video, was not presented to explain the issuance of a BOLO or detail a sequence of events in the investigation leading to Alvarez and Razz.[4]

Lay Person Testimony

The issue presented on appeal is whether a law enforcement officer, testifying as a lay witness, may offer his opinion of the skin color and race of the perpetrators depicted on a video admitted into evidence.[5] “The standard of review for admissibility of evidence is abuse of discretion, limited by the rules of evidence.” Tengbergen v. State, 9 So.3d 729, 736 (Fla. 4th DCA 2009).
The state relies on Fino v. Nodine, 646 So.2d 746 (Fla. 4th DCA 1994), where this court recognized that under section 90.701, Florida Statutes,[6] lay witnesses, under certain circumstances, may offer opinion testimony related to what they perceived. “Acceptable lay opinion testimony typically involves matters such as distance, time, size, weight, form and identity.” Id. at 748-49. “Opinion testimony of a lay witness is only permitted if it is based on what the witness has personally perceived.” Id. at 748.
Even non-eyewitnesses may testify as to the identification of persons depicted or heard on a recording so long as it is clear the witness is in a better position than the jurors to make those determinations. See Johnson v. State, 93 So.3d 1066, 1069 (Fla. 4th DCA 2012) (holding no error in admission of detective’s identification of defendant as individual in surveillance video where defendant changed his appearance after the event recorded in the video, and the detective had a personal encounter with the defendant shortly after the event and before he changed his appearance); State v. Cordia, 564 So.2d 601, 601-02 (Fla. 2d DCA 1990) (finding that officers’ identification of defendant’s voice on a recording was admissible where officers had worked with defendant in the past and were familiar with his voice).
However, “[w]hen factual determinations are within the realm of an ordinary juror’s knowledge and experience, such determinations and the conclusions to be drawn therefrom must be made by the jury.” Ruffin v. State, 549 So.2d 250, 251 (Fla. 5th DCA 1989) (finding the court erred in allowing three officers to identify *543 defendant as the man in the videotape, where the officers were not eyewitnesses to the crime, did not have familiarity with Ruffin, and were not qualified as experts in identification); see also Proctor v. State, 97 So.3d 313, 315 (Fla. 5th DCA 2012) (finding court erred in allowing officer to identify defendant as the perpetrator in a surveillance video where the officer was in no better position than the jury to make that determination); Charles v. State, 79 So.3d 233, 235 (Fla. 4th DCA 2012) (finding court erred in allowing detective to testify that he could not identify the defendant as the person on the surveillance video the first time he watched it, but “he was later able to piece things together and identify the person in the video” as the defendant).
Here, during direct examination of the detective, the state asked the detective whether he could “ID anyone” and was “able to see their faces” on the video “with clarity to make an identification.” The detective said “yes.” The detective’s testimony notwithstanding, no record evidence exists which indicates that the detective was in a better position than the jurors to view the highly inconclusive and indiscernible surveillance video and enlarged stills and thereby determine the skin color and races of the perpetrators. Accordingly, the trial court erred in permitting the detective’s opinion testimony over Alvarez’s objection.

Harmless Error

The type of error that occurred here is subject to harmless error analysis. See Charles, 79 So.3d at 235. As explained by the Florida Supreme Court:
The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. Application of the test requires not only a close examination of the permissible evidence on which the jury could have legitimately relied, but an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.
State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986).
The focus is not on the strength of the state’s case, but rather on the effect of the error on the jury. Johnson v. State, 53 So.3d 1003, 1007. (Fla.2010) (citing Di-Guilio, 491 So.2d at 1139). The issue of whether an error is harmless does not turn on whether the evidence is sufficient, substantial, clear and convincing, or even overwhelming. DiGuilio, 491 So.2d at 1139. “If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.” Id.
Although DiGuilio makes it clear that an error may be harmful even if there is overwhelming evidence of guilt, the Florida Supreme Court has had to revisit this issue many times. See, e.g., Cooper v. State, 43 So.3d 42, 43 (Fla.2010) (quashing and remanding for district court to conduct another harmless error analysis where the district court found that admission of evidence of uncharged acts of sexual abuse was error but affirmed conviction based on “strong evidence of Cooper’s guilt”); Ventura v. State, 29 So.3d 1086, 1089 (Fla.2010) (holding that the district court erred in finding a detective’s comments on defendant’s silence were “harmless beyond a reasonable doubt given the overwhelming evidence of guilt”).
The evidence presented in this case was, to a large extent, circumstantial. There was direct evidence that Alvarez made a *544 statement which appeared to be a confession: “I shot him with that chopper.” However, that evidence was introduced through a hearsay witness.[7] Aside from the detective’s testimony, there was no evidence clearly reflecting the skin color of both the perpetrators. Even Garland, who had known Alvarez for years, testified that she watched the video and could not identify the perpetrators.
During deliberations, the jurors asked to watch the video, and to “manipulate the video, play it, pause it on our own.” The court indicated that could be done only on a “clean computer.” However, the court later informed the jurors that “we have not found a computer that can — where you can take back into your chambers [sic] with the disk of that video and you can— you would have to watch it on the laptop.” The court provided the jurors with a laptop, the DVD, and instructions on playing the video, but it is unclear whether the jurors were able to pause the video.
We possess a reasonable doubt that if the jury was not able to determine for itself the skin color of the perpetrators, each juror may have relied on the detective’s testimony, which then may have greatly factored into their verdict. We take specific notice that, at the state’s prodding, the detective unequivocally stated that he could see the faces of the perpetrators and “with clarity to make an identification.”
This court has observed that when a police officer gives impermissible identification testimony, “[t]here is the danger that jurors will defer to what they perceive to be an officer’s special training and access to background information not presented during trial.” Charles, 79 So.3d at 235. Even if we assume that the evidence in this case is overwhelming, the state has not established beyond a reasonable doubt that the jury did not rely on certain portions of the detective’s testimony which the trial court erroneously permitted the jury to hear.
Accordingly, we must reverse and remand for a new trial.

Reversed and remanded for new trial.

WARNER and GERBER, JJ., concur.

. The trial record reflects that Alvarez has light skin, and Razz has dark skin.

. At sidebar, the court sought assurances from the state that it would not elicit testimony from the detective as to an identification of the perpetrators portrayed on the surveillance tape:
The Court: He's not going — he’s not going— and I’ll tell you what I was worried about. That he's going to say he knows these people.
Prosecutor: Oh, no.
Second Prosecutor: No. He’s not going to say that.

. The detective referred to the first man who entered the store as “suspect one” and the second man as "suspect two.”

. A review of the entire set of proceedings below shows no indication that a BOLO was ever issued for anyone based on the detective’s determination that the surveillance video revealed the perpetrators to be Hispanic, light-skinned or dark-skinned.

. Although the detective testified as a law enforcement officer, his testimony regarding the skin color and race of the perpetrators on the surveillance video did not involve "scientific, technical, or other specialized knowledge,” and was not based on his "knowledge, skill, experience, training, or education” in any particular field. See § 90.702, Fla. Stat. (2010). The state concedes that the detective’s testimony was that of a lay person.

.Section 90.701, Florida Statutes (2010), provides that a lay witness may offer opinion testimony related to what the witness perceived if:
(1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and
(2) The opinions and inferences do not require a special knowledge, skill, experience, or training.

. The jury asked to review transcripts of the testimony of the corrections officer and the inmate who testified regarding Alvarez’s other statements.