THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

RICO JOHNSON,

      Appellant,

 v.                                                                Case No.  5D15-2721

STATE OF FLORIDA,

      Appellee.
_____/

Opinion filed April 7, 2017

Appeal from the Circuit Court for
Seminole County,
Debra S. Nelson, Judge.

James S. Purdy, Public Defender, and
Matthew Funderburk, Assistant Public
Defender, Daytona Beach, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Kristen L. Davenport,
Assistant Attorney General, Daytona
Beach, for Appellee.

TORPY, J.

Appellant, Rico Johnson, challenges his conviction for conspiracy to traffic in cocaine.  Among other claims, he argues that the trial court erred by permitting police officers to give opinion testimony identifying his and a co-conspirator's voices on intercepted telephone calls.  He argues that because the police officers lacked any "prior special familiarity" with his voice, as witnesses to the crime or otherwise, admitting their testimony invaded the province of the jury. Based on our conclusion that the trial court

did not abuse its discretion in admitting the voice identification testimony, and that the other claims of error do not merit discussion, we affirm.

In September 2014, the City/County Investigative Bureau in Seminole County (the "CCIB") began investigating the sale and distribution of cocaine that allegedly involved Appellant, co-conspirator Edward Howard, Jr., and more than one hundred other suspects. A wiretap on Howard's telephone allowed the CCIB to record calls and receive data about intercepted phone calls, including the date and time of the call, whether it was an incoming or outgoing call from the wiretapped phone, and the numbers dialed by the wiretapped phone. The investigating agents correlated the suspects' names with phone numbers and video surveillance of them and relayed that information to Agents Matt Scovel, the lead investigative agent, and Kevin Pederson, the administrator of the software system that intercepted the phone calls. During the investigation, Agents Scovel and Pederson listened to thousands of intercepted phone calls involving the suspects.

Based on the intercepted phone calls, the CCIB executed a search warrant at Howard's home on a day it suspected that Appellant would be delivering a supply of cocaine. Although cannabis and cash were found in the home, they found no cocaine. During the search, Agent Scovel spoke with Appellant for approximately five minutes but Agent Scovel "did most of the talking" because Appellant "felt uncomfortable talking to [him]." At the same time, Agent Pederson had a five-minute conversation with Howard, who spoke for approximately half of the time. This was the only time that either agent personally spoke with Appellant or Howard. Based on the intercepted phone calls, sixteen suspects, including Appellant and Howard, were eventually arrested and charged with conspiracy to traffic in cocaine.

2

At trial, the State called Agents Scovel and Pederson to identify Appellant's and Howard's voices, respectively, on the recorded phone calls. Agent Scovel testified that he recognized Appellant's voice from the intercepted phone calls, their conversation at the time of the search, and a DVD recording of a hearing where Appellant testified for approximately twenty minutes. That recording was not entered into evidence at Appellant's trial or played for the jury. Agent Pederson testified that he recognized Howard's voice from the intercepted phone calls and their conversation at the time of the search. The State later played several phone calls for the jury in which Appellant, Howard, and other suspects allegedly discussed drug transactions in coded terms. According to Agent Scovel's testimony, the coded calls involved discussions between Howard and Appellant, and between Howard and other co-conspirators, about buying and selling cocaine, the amounts of and prices for the cocaine, the availability of buyers, and plans to meet to exchange the cocaine for money.

Voice identification testimony has been utilized in this state in criminal prosecutions since at least 1907. *See Mack v. State*, 44 So. 706 (Fla. 1907). The origins of this form of identification date back to the year 1660. *Id.* at 708. In *Mack*, the victim was attacked from behind in the dark of night. Before the victim lost consciousness from being choked by her assailant, the assailant uttered twelve words. The victim positively identified the defendant as her attacker after recognizing his voice in a post-crime show-up. The Florida Supreme Court affirmed the conviction despite a challenge to the reliability of this form of evidence. *Id.* at 709-10.

Twenty-three years later, the Florida Supreme Court again considered the admissibility of voice identification testimony. In *Martin v. State*, 129 So. 112 (Fla. 1930),

3

the defendant was in the victims' presence in a dimly lit room for about five minutes. Characterizing the later voice identification of the defendant by the two victims as "direct and positive proof" of identity, the supreme court emphasized that this form of evidence is ordinarily admissible despite threshold challenges to its credibility, leaving for the jury to decide its probative value. *Martin*, 129 So. at 115.

Indeed, a cursory review of decisions in this and other jurisdictions reveals hundreds of cases involving brief encounters between the victim of a crime and a defendant under circumstances where the defendant can be identified only by voice comparison. In the typical situation, the spoken words are few and the victim had no prior familiarity with the defendant's voice before making the identification. The courts have uniformly approved the admission of this form of evidence, concluding that the jury should determine its credibility.

In a more recent case, *Macias v. State*, 673 So. 2d 176 (Fla. 4th DCA 1996), a nighttime battery and strong-arm robbery took place over a span of between two and ten minutes. The victim was unable to see the defendant's face but identified him based on his voice. The defendant uttered about thirty words during the crime. Thirty-two days after the crime, police played for the victim a tape-recorded interview with the defendant. The victim positively identified the defendant's voice as that of the assailant. The taped interview used as the exemplar lasted only three minutes, during which time the police did the majority of the talking. Although much of the recording was unintelligible, the defendant could be heard uttering the words: "I'm not going to be railroaded again." *Macias*, 673 So. 2d at 179. Three months after the crime, the victim again made a voice identification of the defendant after hearing him speak at a pretrial bond proceeding.

4

Emphasizing the thirty-two-day span of time between the crime and the first identification, our sister court concluded that the method used by police to present the voice exemplar to the victim was unduly suggestive. It nevertheless affirmed the conviction because there did not exist a "substantial likelihood of irreparable misidentification." *Id.* at 181.

Here, no argument was advanced below or on appeal that the method of identification was unduly suggestive.[1] Rather than suggestiveness, Appellant argues two points, both of which require an analysis of the same section of the evidence code. First, he contends that, because the voice identification was made by police, the after-the-crime verification was unauthorized. Second, he urges that, because the jury could have listened to the DVD recording of the hearing and itself compared the voices, the introduction of the non-expert, opinion testimony of the agents usurped the function of the jury. Appellant places his primary reliance for both arguments on *Evans v. State*, 177 So. 3d 1219, 1229 (Fla. 2015). After careful review of *Evans*, we conclude that Appellant's reliance on this precedent is misplaced.

In *Evans*, a 911 operator received and recorded a brief conversation between two victims and an unidentified assailant during a heated confrontation immediately preceding

---

[1] In this case, the face-to-face discussions between the agents and the co-conspirators occurred contemporaneous with the last documented moments of the conspiracy. Agents had been led to the point of the suspected exchange of money for drugs, expecting to find the yet-to-be-identified co-conspirators at the premises. After having confronted and having identified Appellant and Howard, any further attempt at identification through a show-up procedure would have been superfluous. Although the dissent does not argue that the identification here was suggestive, it cites *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), where the witness was shown a single photograph of the defendant in a show-up procedure. There, despite the suggestiveness of the pretrial identification, the Court affirmed the conviction based upon the in-court identification, relying upon the "good sense and judgment" of the jury to "intelligently [weigh] . . . the identification testimony." *Id.* at 116.

5

the murders.  To prove that the unidentified assailant was the defendant, the state presented the testimony of a police detective who had compared what she heard on the 911 recording to a later-obtained sample of the defendant's voice retrieved from recorded jail phone calls made by the defendant after his arrest.  On appeal, the supreme court concluded that the "detective usurped the role of the jury by being permitted to opine that a voice heard on a 911 call-back recording belonged to the defendant."  *Evans*, 177 So. 3d at 1224.  In its discussion on this point, the *Evans* court relied heavily on our opinion in *Ruffin v. State*, 549 So. 2d 250, 251 (Fla. 5th DCA 1989).  In *Ruffin*, three police officers who had not witnessed a drug transaction in person, testified that, in their opinions, the man depicted in the video recording of the transaction was indeed the defendant.  We held that the lay opinion testimony erroneously "invad[ed] . . . the province of the jury." *Ruffin*, 549 So. 2d at 251; *see also Alvarez v. State*, 147 So. 3d 537, 542-43 (Fla. 4th DCA 2014) (where detective was in no better position to view and interpret poor-quality video, admission of opinion testimony invaded province of jury).

We begin our analysis of *Evans* by emphasizing that it is not premised on section 90.901, Florida Statutes, which addresses the requirement of authentication that an item offered into evidence is what its proponent claims.  Nor would an authentication argument be successful here.  Authentication of a voice by a lay witness requires only a minimal amount of exposure to the unknown by the witness, together with a comparison of a known sample of the voice.  *See, e.g., United States v. Bush*, 405 F.3d 909, 919 (10th Cir. 2005) (to be authenticated and thus admissible, voice identification only need rise to level of minimal familiarity); *United States v. Cerone*, 830 F.2d 938, 949 (8th Cir. 1987) (agent who listened to recordings and spoke to defendant several times thereafter could

6

authenticate voice; minimal familiarity sufficient); *United States v. Axselle*, 604 F.2d 1330, 1338 (10th Cir. 1979) (agent permitted to identify defendant's voice in single phone call after hearing his voice in court on one occasion); *Vilsaint v. State*, 127 So. 3d 647, 650 (Fla. 4th DCA 2013) (detective permitted to authenticate defendant's voice on tape based on ten-to-fifteen-minute discussion after his arrest; credibility of identification for jury to determine). The threshold for authentication is low because the trier of fact makes the ultimate determination of whether the evidence is genuine. C. Ehrhardt, *Florida Evidence* § 901.1 (2016 ed.).

That *Evans* is not an authentication case is made clear by the court's express holding that the "lead detective usurped the role of the jury by being permitted to opine that a voice heard on a 911 call-back recording belonged to the defendant." *Evans*, 179 So. 3d at 1224. *Evans* also distinguished, but did not overrule, the main precedent upon which the dissenting justices relied, *Vilsaint v. State*, 127 So. 3d 647 (Fla. 4th DCA 2013), which it labeled as a "case [that] concerns a trial judge's determination of whether the recording can be authenticated and thus presented to the jury." *Evans*, 177 So. 3d at 1230. In *Vilsaint*, a police detective authenticated the defendant's voice on a tape recording based upon a brief face-to-face interview during which the defendant spoke only thirty-six words, most of which were "yes" or "no." 127 So. 3d at 649.

Rather than authenticity, the evidentiary error in *Evans* involved section 90.701, Florida Statutes, which addresses the circumstances under which lay opinion testimony is admissible. One central tenet of this statute is that the testimony must be helpful to the jury in determining a fact at issue. *See* Ehrhardt, *supra*, at § 701.1 n.2; 7 Wigmore, *Evidence* §§ 1917-18 (Chadbourn rev. 1978) (lay opinions are inadmissible when jury can

7

draw same conclusion). In *Ruffin*, we concluded that the opinion testimony would not be helpful because the jury could look at the surveillance tape and compare it to the defendant as he appeared in the courtroom—the same comparison upon which the police officers based their opinions. Because the comparison required no special expertise, the use of this evidence, especially from witnesses in positions of authority, was unfairly prejudicial. *Alvarez* was similarly premised. In that case, the police witness simply interpreted a surveillance video. The Fourth District emphasized that the officer was in no better position than the jury to render the opinion. Accordingly, it reversed the conviction based on the erroneous admission of the opinion evidence. *Alvarez,* 147 So. 3d at 542-43. Central to an understanding of *Alvarez* was its discussion of *Johnson v. State*, 93 So. 3d 1066, 1069 (Fla. 4th DCA 2012), which it distinguished because, in *Johnson*, the defendant's appearance had changed before trial, and the police identification witness had observed the defendant after the crime occurred but before he changed his appearance. *Id.* at 542.

The dissent seems to dispute that "helpfulness" is a predicate for the admission of lay opinion testimony, claiming that this concept is erroneously derived from federal cases construing federal rule 701 and from *Alvarez*, which it calls into doubt as a pre-*Evans* case. Although the word "helpfulness" does not appear in the Florida code, that the concept is implicit in the Florida code was confirmed in *Alvarez*, the holding of which is well grounded in authoritative works*. See* Ehrhardt, *supra*, at § 701.1 n.2; Wigmore, *supra*, at §§ 1917-18; *see also* Ehrhardt, *supra*, at § 102.1 (explaining that most differences between Florida code and federal rules were intended to clarify and "not intended to change the substance of the Federal Rule"). *Alvarez* preceded *Evans*, but it

8

is clearly not in tension with *Evans*. It reached the same conclusion as *Evans* and *Ruffin* (upon which *Evans* principally relied), reversing the conviction based on inadmissible lay opinion. Nevertheless, even if the dissent is correct that "helpfulness" is not a predicate for the admission of lay testimony under the Florida code, the elimination of this implied predicate would authorize a more liberal rule for the admission of lay testimony under Florida law, not the contrary as the dissent implies.

The dissent also makes a vague assertion that section 90.701 and federal rule 701 have been "interpreted differently." Because *Evans* does not mention either section 90.701 or any federal precedents, we assume the dissent's argument is that federal precedents construing rule 701 were implicitly rejected in *Evans*. Besides the lack of textual support for this argument, it contravenes a prior express directive from the supreme court that the Florida Evidence Code "should be construe[d] . . . in accordance with federal court decisions." *Moore v. State*, 452 So. 2d 559, 561-62 (Fla. 1984).

*Evans* is a logical application of *Ruffin* and *Alvarez*. In *Evans*, the state made the decision not to offer the exemplar telephone recordings into evidence. Had the recordings been admitted, *Evans* would have been directly, factually analogous to *Ruffin* and *Alvarez*.[2] The jury would have been able to make the same comparison that was made by the police because the police enjoyed no expertise or special familiarity with the voice. Because the state made the decision not to give the exemplar to the jury, the *Evans* court treated it as an invasion-of-the-province-of-the-jury case. In other words, it would

---

[2] Arguably, a distinction can be made between visual identification cases and voice identification cases. In the former, unless the defendant changes his appearance before trial, the jury can see him in person in the courtroom and compare his appearance to the image on a photograph or video tape. In a voice case, unless the defendant testifies, the jury is left to compare the incriminating recording to a recorded exemplar.

9

circumvent the intent of the evidence code to allow the state to disadvantage the jury by withholding tangible evidence in its possession so as to justify the use of otherwise inadmissible lay testimony. Simply put, *Evans* is a case where the police merely compared one recording to another, an exercise that was well within the province of the jury, had it been given the opportunity to do so.[3]

In *Bush*, the Tenth Circuit addressed both authentication and the "helpfulness" predicate of lay opinion testimony in the context of a police officer's voice identification testimony. The *Bush* court's discussion of the "helpfulness" predicate is particularly instructive and illustrates the distinction we highlight here between helpful and unhelpful lay opinion testimony:

> Mr. Bush relies on *United States v. LaPierre*, 998 F.2d 1460 (9th Cir. 1993). *LaPierre* is distinguishable from the instant case, if not inapposite. In *LaPierre,* a police officer investigating bank robberies allegedly committed by the defendant identified him in bank surveillance photographs. *Id.* at 1465. The Ninth Circuit held that because the jury could view the photographs and identify the perpetrator, the officer's testimony "ran the risk of invading the province of the jury and unfairly prejudicing" the defendant. *Id.* Based in part on this reasoning, the court discouraged the use of lay opinion identification testimony. *Id.* We are not convinced that *LaPierre* applies here or furthers Mr. Bush's argument in any manner.
>
> In *LaPierre,* the testifying officer, like the jury members, had never seen the defendant in person before the trial. *Id.* In essence then, the officer's identification of the defendant was no different from what the jury members themselves were required to do in comparing the surveillance photographs to the defendant in the courtroom. As a result, the court concluded the officer's overall level of familiarity with the defendant's appearance fell short of the standard of helpfulness required by Rule 701*. Id.* By contrast, Detective

---

[3] The outcome might be different in a case where the defendant is successful in objecting to the state's attempts to offer the exemplar into evidence.

> Bench conducted face-to-face conversations with Mr. Bush on at least three occasions and engaged in several phone conversations with J.R. The jury was denied an opportunity to engage in any comparison of Mr. Bush's voice to that of J.R. because Mr. Bush exercised his right not to testify at trial and only limited recordings were available from the phone conversations. Detective Bench's testimony was therefore helpful because it assisted the jury in determining a fact issue that was otherwise hampered by Mr. Bush's constitutionally protected silence at trial. The district court's ruling regarding the admissibility of Detective Bench's lay opinion testimony was not an abuse of discretion.

*Bush*, 405 F.3d at 917–18 (footnote omitted).

The holding in *Evans* embraces the same distinction drawn by the *Bush* court by limiting the use of lay identification testimony to circumstances where the identification witness was an eyewitness to the crime or demonstrates a "prior special familiarity" with the defendant's voice. *Evans*, 177 So. 3d at 1229. In both of these scenarios, the identification witness has an advantage over the jury. An "eyewitness" to a crime has direct contact with the criminal, giving rise to a unique opportunity for sensory perception. Accordingly, even when a surveillance tape of the defendant during the commission of the crime is played for a jury, the "eyewitness" may still give an identification opinion because the personal contact during the event gives the witness a distinct perspective. "Prior special familiarity" also involves a witness with some advantage over the jury, gained by personal contact with the defendant, apart from that which the jury could experience in the courtroom.

In this case, the identification testimony satisfies both criteria. Agents Scovel and Pederson were "witnesses" to the crime. We do not interpret the term "eyewitness," as used in *Evans*, to exclude witnesses who hear, rather than see, the crime. Indeed, voice identification usually involves witnesses who did not see the criminal. And, there is

11

seldom an "eyewitness" to a conspiracy, which, by definition, merely involves an agreement to commit a crime. Unlike *Evans*, where the officers became involved in the investigation after the crime was completed, here, the agents were witnesses to the conspiracy as it unfolded. Unlike the typical property crime or crime of violence, a conspiracy is an ongoing crime that might span days, weeks, months, or years. Here, the conspiracy did not end until the conspirators were apprehended. During the course of the conspiracy, the agents listened to thousands of conversations, culminating in the discovery of a probable place and time for the exchange of drugs and money.[4] That place was later identified as belonging to Howard. After studying the voices of the conspirators over an extensive period of time, the agents had the opportunity to confront the conspirators and hear their voices in person. As witnesses, under *Evans*, it was not inappropriate for the jury to receive their lay opinions.

Even if the officers here were not "eyewitnesses," as contemplated by *Evans*, we view this as a "prior special familiarity" case. What this means in the context of section 90.701 is that, prior to trial, the identification witness must have gained familiarity with the defendant that assists the witness in identifying him as the perpetrator and which the jury cannot itself acquire. *Johnson* is an example of a case where the police identification witness had "prior special familiarity." Although the jury had the ability to compare the

---

[4] The dissent emphasizes that Agent Scovel did not actually listen to the intercepts until after they were recorded. Whether the agents heard the mechanically intercepted voices during or after the conversation seems to us a formalistic distinction having no effect on the reliability of the voice comparison. The point we emphasize is that, under the *Evans* construct, the agents were clearly investigating the crime while it was in progress. The investigation culminated in the search and arrests, in which Agent Scovel personally participated. This was not a case like *Evans*, where the police participation came after the crime was completed.

12

surveillance video with the defendant's in-court appearance, his appearance had changed since the taking of the video and the police identification witness had observed him before he changed his appearance but after the crime. The fact that the "prior" knowledge came after the crime was committed, but before the trial, was inconsequential to the holding in that case. *Bush* and *Vilsaint* are examples of "prior special familiarity" in the context of voice identification. In *Bush*, the personal contact between the police officer and the defendant was not capable of replication for the jury because the defendant did not testify. *Vilsaint* is similar to *Bush*. There, the police identification witness had personal contact with the defendant during the booking process. Here, like in *Bush* and *Vilsaint*, the agents' personal contact with the co-conspirators was the type of identification testimony that could help the jury in identifying the voices on the tapes. This is clearly not a case like *Evans*, *Ruffin* or *Alvarez*, where police simply performed an after-the-fact comparison between two recordings, offering nothing additional to aid the jury.

The dissent's central argument—that *Evans* sets a "heightened" standard for the admission of voice identification testimony to foster greater reliability—is a straw man argument that confuses the holding of the case. *Evans* did not compel the exclusion of the tangible recordings or condemn this method of identification. The upshot of *Evans* is that the jury must compare the recordings, unpersuaded (or unassisted) by duplicative lay opinions. At best, the danger of misidentification is unaffected by the exclusion of the lay opinion evidence.

The dissent's characterization of *Evans* as a reliability heightening case also conflates the distinct evidentiary concepts at issue in voice identification cases, each of which is rooted in a distinct policy. The prohibition against suggestive show-up methods—

not at issue here—protects against tainted identifications and promotes reliability. Authenticity too establishes a minimal threshold for reliability but is also not at issue here. By contrast, the "helpfulness" predicate for lay opinion testimony has nothing to do with the accuracy of the opinion. It is grounded in a policy against invading the jury's province. *See* Wigmore, *supra*, at §§ 1917-18. As the *Evans* court emphasized, especially when the inadmissible lay opinions are offered by persons in positions of authority like police officers, the admission of these unhelpful lay opinions creates the enhanced risk that the jury might give undue deference to the lay opinions. Adherence to the "helpfulness" predicate, while not logically bearing on the reliability of the identification, fosters the distinct goal of jury independence. *See Evans*, 177 So. 3d at 1230.

Even if we indulge the dissent in a debate over reliability of the identification evidence, we conclude that the identity evidence presented here was no less reliable than in the vast majority of cases where identification is an issue. The fact that the duration of the post-arrest, personal contact was brief is not a distinguishing feature of this case that affects the admissibility of the evidence. Many, if not most, identification cases, voice or otherwise, involve brief encounters during the crime and/or during the post-crime identification process. In *Macias*, for example, the assailant uttered about thirty words during the encounter with the victim. Thirty-two days later the victim identified him from a three-minute recording, during which, like the face-to-face interview here, the defendant spoke very few words. *Vilsaint* too involved brief personal contact with the defendant by police during the booking process, after his arrest.

Buttressing the opinion testimony here was the additional circumstantial evidence gleaned from the content of the conversations themselves. From these conversations,

14

the universe of suspects was considerably narrowed.  Police became aware of a probable exchange at a particular place and time.  When the police converged on the place, later confirmed to be Howard's house, Appellant and Howard were present. This circumstantial evidence of identity supported the opinion testimony offered at trial. It was for the jury to decide whether the totality of the identity evidence satisfied the high burden of proof for a criminal conviction. *See Manson*, 432 U.S. at 116 ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

AFFIRMED.


COHEN, C.J., concurs.
ORFINGER, J., concurs in part, and dissents in part, with opinion.

ORFINGER, J., concurring in part, and dissenting in part.     Case No. 5D15-2721

The holding of Evans v. State, 177 So. 3d 1219, 1229 (Fla. 2015), is clear: the "testimony that a witness recognizes the voice of the accused is inadmissible . . . unless the testifying witness (1) was an eyewitness to the crime, (2) has some prior special familiarity with the voice of the defendant, or (3) is qualified as an expert in identification."[5] Because I conclude the majority misapplies this holding, I respectfully dissent.[6]

The legal system relies heavily on witness identifications for investigating and prosecuting crimes. However, identification errors are the leading cause of false convictions. Cindy E. Laub, Lindsey E. Wylie & Brian H. Bornstein, Can the Courts Tell an Ear from an Eye? Legal Approaches to Voice Identification Evidence, 37 Law & Psychol. Rev. 119, 119 (2013). Because reliability is the linchpin in determining the admissibility of identification testimony, Manson v. Brathwaite, 432 U.S. 98, 114 (1977), and the role of witness identification is so important, especially when there is no physical evidence, the Florida Supreme Court limited the witnesses able to give opinion testimony about the identity of a recorded voice in Evans. See C. Ehrhardt, Fla. Evidence § 901.6 (2016 ed.).

To ensure the reliability of opinions presented to the jury, Evans raised the standard for a voice identification by requiring the witness offering an opinion on the identity of a speaker to be either an eyewitness or a witness with prior special familiarity

---

[5] The Florida Supreme Court decided Evans after Johnson's trial.

[6] I concur with the majority that Johnson's other claims of error lack merit.

16

with the voice.[7]  As a result, Evans demands more than did the earlier cases relied on by the majority.  In an effort to satisfy the Evans construct, the majority contends that Agent Scovel either was an eyewitness to the crime (a position not advanced by the State) or had sufficient prior special familiarity with Johnson's voice to be able to reliably identify it on the recordings.  I disagree with both contentions.

First, with respect to the majority's position that Agent Scovel was an eyewitness, an eyewitness is someone who personally sees an event and can describe it later. Eyewitness, Black's Law Dictionary (10th ed. 2014); see also Earwitness, Black's Law Dictionary (10th ed. 2014) (defining earwitness as witness who testifies about something he or she heard, but did not see).  I do not dispute that Agent Scovel listened to the tapes of the recorded telephone calls or that the tapes were properly authenticated.  But the question here is not one of authentication; it is whether Agent Scovel is able to reliably opine—either as an eyewitness or as a witness with prior special familiarity with Johnson's voice—that he recognized Johnson's voice on the tape.[8]  Agent Scovel was not present when the calls were recorded, and did not observe Johnson speaking on the phone while simultaneously listening to the calls.  Had that occurred, arguably, he could be considered an eyewitness.  But, with the exception of one brief personal conversation with Johnson, Agent Scovel was in no better position to identify the voice on the recordings than anyone else who listened to the tapes and the recording of Johnson's pretrial testimony.

---

[7] Expert testimony is also permitted by Evans, but is not an issue in this case.

[8] Because this case concerns lay opinion testimony, I need not distinguish Vilsaint v. State, 127 So. 3d 647 (Fla. 4th DCA 2013), which the majority concedes is a case regarding authentication.  See slip opinion at 7.

The majority's reliance on Mack v. State, 44 So. 706 (Fla. 1907), Martin v. State, 129 So. 112 (Fla. 1930), and Macias v. State, 673 So. 2d 176 (Fla. 4th DCA 1996), is misplaced. Each of those cases involved the victim of the crime testifying as to what the perpetrator said while the crime was being committed. The victims in those cases were prototypical eyewitnesses to the crimes and as such, satisfied the Evans requirements. Just as the officers in Ruffin v. State, 549 So. 2d 250 (Fla. 5th DCA 1989), and Alvarez v. State, 147 So. 3d 537 (Fla. 4th DCA 2014), were not eyewitnesses to a crime merely because they later watched a recorded video of the crime, Agent Scovel is not an eyewitness to the conspiracy merely because he later listened to the recorded phone conversations discussing it.

Perhaps the strongest support for the majority opinion can be found in Alvarez, which held that "[e]ven non-eyewitnesses may testify as to the identification of persons depicted or heard on a recording so long as it is clear the witness is in a better position than the jurors to make those determinations." 147 So. 3d at 542. Because Agent Scovel had a brief, in-person conversation with Johnson, he was in a slightly better position than the jurors to determine if Johnson's voice was on the recorded telephone calls. However, this "better position than the jurors" language—which the majority refers to as the "helpfulness" standard—cannot be found in Evans, which postdates Alvarez.[9] It was apparently adopted from Federal Rule of Evidence 901 and numerous federal cases cited

_____

[9] The State could have allowed the jury to determine for itself if Johnson's voice was heard on the incriminating recordings by playing the recording of the pretrial hearing at which Johnson testified, or by compelling him to give a voice exemplar, either before or at trial, in order to evaluate the physical properties of his voice. See Fla. R. Crim. P. 3.220(c)(1)(B); United States v. Dionisio, 410 U.S. 1 (1973).

18

by the majority, but it is premised on what appears to be a lower standard for the admissibility of opinion testimony in federal courts.

Although I agree with the majority that the provisions of the Florida and federal evidence codes regarding lay opinion testimony are similar, one need only compare Evans with United States v. Bush, 405 F.3d 909, 919 (10th Cir. 2005), to see that they have been interpreted differently by Florida and federal courts. Had this case been prosecuted in federal court, Agent Scovel's opinion testimony would certainly have been allowed. See, e.g., Bush, 405 F.3d at 919 (holding voice identification need only rise to level of minimal familiarity); United States v. Axselle, 604 F.2d 1330, 1338 (10th Cir. 1979) (holding single telephone call, combined with hearing voice in court, is sufficient for voice identification testimony to go to jury). However, I am compelled to follow the interpretation of the Florida evidence code by the Florida Supreme Court, not the interpretation of the federal evidence code by federal courts. Under Florida law, because Evans raised the bar for the admissibility of an opinion on voice identification, I conclude Agent Scovel was not an eyewitness competent to render an opinion on whose voice was heard on the recordings.

Turning to the majority's position that Agent Scovel had adequate prior special familiarity with Johnson's voice that qualified him to testify, it seems a matter of common sense that the ability to identify a speaker from his or her voice depends on the number of exposures to the voice in question, the quality of these exposures, and the nature of the identification process. See Lawrence Solan & Peter M. Tiersma, Hearing Voices: Speaker Identification in Court, 54 Hastings L.J. 373, 375 (2003). The Evans court incorporated this common sense approach by creating a standard permitting a witness to

19

identify the voice of the defendant when the witness was previously familiar with the defendant. Evans, 177 So. 3d at 1229; see State v. Cordia, 564 So. 2d 601, 601-02 (Fla. 2d DCA 1990) (permitting witness to testify who had known defendant "for a significant period of time" and had spoken to defendant in person and over telephone); Hardie v. State, 513 So. 2d 791, 792 (Fla. 4th DCA 1987) (holding that police officers who had prior knowledge and contact with defendant could properly testify and identify him).

Here, however, Agent Scovel lacked the requisite prior special familiarity with Johnson. Before initiating the investigation, Agent Scovel had no contact with Johnson. During the course of the investigation, Agent Scovel spoke to Johnson only once, during the search of Howard's house, and Johnson said little during that conversation. Other than this brief conversation, the only familiarity Agent Scovel had with the voice that he believed to be Johnson's was through listening to recordings of intercepted phone conversations and a subsequent recording of Johnson's pretrial hearing. This limited interaction with Johnson is not sufficient to constitute prior special familiarity. Indeed, Evans specifically held that "a police officer investigating a particular suspect's voice **after** the investigation is ongoing . . . does not constitute the requisite prior familiarity with the suspect." 177 So. 3d at 1230 (emphasis added); see Proctor v. State, 97 So. 3d 313, 315 (Fla. 5th DCA 2012); cf. Cordia, 564 So. 2d at 601-02; Hardie, 513 So. 2d at 792. While the majority contends that the timing of an officer's interaction with a voice is inconsequential, the Florida Supreme Court held otherwise. It is clear from Evans that an investigating officer does not obtain prior special familiarity with a suspect's voice if his or her first encounter with the voice occurs after a criminal investigation into the suspect's behavior has begun, regardless of whether at that time the crime has been completed.

20

<u>Evans</u>, 177 So. 3d at 1230.  Additionally, a trial court's error in permitting an improper identification "may be exacerbated where the testimony comes from a police officer" and the jury is aware of that position because officers are often regarded as highly credible. <u>Martinez v. State</u>, 761 So. 2d 1074, 1080 (Fla. 2000); <u>see also</u> <u>Evans</u>, 177 So. 3d at 1230 (finding use of questions that elicit witness's position as police officer when witness is identifying defendant's voice or image may be reversible error even when identification itself is permissible).

In the end, the majority distinguishes this case from <u>Evans</u> by claiming that Agent Scovel was an eyewitness because he listened to the recordings and spoke briefly in-person with Johnson, whereas the detective in <u>Evans</u> had no personal interaction with the defendant.  Although this is accurate, it is insufficient under the heightened <u>Evans</u> standard to make Agent Scovel an eyewitness or to give him the requisite prior special familiarity with Johnson's voice to reliably identify it in the recordings.[10]  I would reverse for a new trial.

---

[10] Likewise, I do not believe Agent Pederson was an eyewitness or had prior special familiarity with Howard's voice to reliably identify it in the recordings.